SOUTHWESTERN PORTLAND CEMENT CO. et al. v. KEZER. (No. 379.)†

(Court of Civil Appeals of Texas. El Paso. Feb. 18, 1915. On Rehearing, March 11, 1915.)

1. LIMITATION OF ACTIONS ☞55—RUNNING OF STATUTE—ACCRUAL OF RIGHT.
    Where defendant placed obstructions in a natural water course, which after some years cast flood waters on plaintiff's land, limitations against plaintiff's right to recover damages did not begin to run at the time of the placing of the obstructions, but only from the time of the injury.
    [Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 296–306; Dec. Dig. ☞55.]

2. EVIDENCE ☞543 — OPINION EVIDENCE — INJURIES TO CROPS.
    In an action for damages for the overflowing of his land and destruction of his crops, plaintiff, having testified that he had been engaged in the cultivation of those crops for about 20 years, has sufficient expert knowledge to testify as to the value of the crops destroyed.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2356½–2358; Dec. Dig. ☞543.]

3. APPEAL AND ERROR ☞742—ASSIGNMENTS—PROPOSITIONS.
    A proposition not germane to the assignment of error will not be considered.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. ☞742.]

4. EVIDENCE ☞113 — RELEVANCY — PLEADINGS.
    Though plaintiff's petition asserted generally the destruction of his crops, including rose bushes, etc., but did not aver the number of roses raised on a bush or their value, plaintiff may, for the purpose of showing his loss, testify as to the number of roses raised per bush and their price.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 259–296; Dec. Dig. ☞113.]

5. EVIDENCE ☞113—SPECULATIVE EVIDENCE—ADMISSIBILITY.
    In an action for damages for the destruction of ornamental trees by the overflowing of plaintiff's land, plaintiff, who was in the nursery business near a city where there was a considerable demand, may testify as to the market price of such trees.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 259–296; Dec. Dig. ☞113.]

6. EVIDENCE ☞474 — EXPERT TESTIMONY — DISCRETION OF COURT.
    Where plaintiff, who was suing for damages for the overflowing of his land, showed that he had been familiar with the river which overflowed for many years, and also knew the effect of the placing of obstructions in the stream by defendant, it is not an abuse of the trial court's discretion to permit him to testify as to the cause of the overflow.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2196–2219; Dec. Dig. ☞474.]

7. EVIDENCE ☞545 — OPINION EVIDENCE — EXPERTS.
    The admission of opinion evidence cannot be held erroneous, though the witness did not on direct examination qualify himself, where his cross-examination showed that he was qualified.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2360–2362; Dec. Dig. ☞545.]

8. EVIDENCE ☞544 — OPINION EVIDENCE — EXPERTS.
    An expert civil engineer who was familiar with the river in both flood and low water stages, and who had platted it and surrounding land, may testify as to the cause of an overflow.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2356; Dec. Dig. ☞544.]

9. TRIAL ☞260—INSTRUCTIONS—REFUSAL.
    The refusal of requests covered by the charge given is not error.
    [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. ☞260.]

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

**10. WATERS AND WATER COURSES ⚖➡179—FLOODING OF LANDS—INSTRUCTIONS.**

In an action for damages for flooding of plaintiff's land, the court's charge that although the defendant placed obstructions in the flood channel and bed of the stream, yet if the flooding of plaintiff's land was not proximately caused by such obstructions, but by other obstructions or natural obstructions, verdict should be for defendant, sufficiently presents the issues that the floods were not caused by defendant's wrongful act.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 244–250, 256–259, 263, 264; Dec. Dig. ⚖➡179.]

**11. WATERS AND WATER COURSES ⚖➡179—FLOODING OF PROPERTY—ACTIONS FOR DAMAGES—VERDICT.**

Where the overflowing of land not only ruined part of the property, but destroyed the crops on the whole tract, the jury having been charged that plaintiff, if compensated in full for the value of the land utterly destroyed, cannot thereafter recover damages for its overflow, need not return separate amounts for each element of damage.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 244–250, 256–259, 263, 264; Dec. Dig. ⚖➡179.]

**12. WATERS AND WATER COURSES ⚖➡179—ACTIONS—EVIDENCE—SUFFICIENCY.**

Evidence that an overflow was caused by obstructions placed in a stream by defendant, *held* for the jury.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 244–250, 256–259, 263, 264; Dec. Dig. ⚖➡179.]

**13. DAMAGES ⚖➡153—PLEADING—NECESSITY.**

Where, in an action for the flooding of land, the petition alleged in separate items the several items of property destroyed or injured, and the amount of damages claimed, it was unnecessary for the petition to allege the measure of damages.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 422–425; Dec. Dig. ⚖➡153.]

**14. DAMAGES ⚖➡112—CROPS—MEASURE OF.**

The measure of damages for destruction of growing crops is their value at the time, place, and condition in which they were immediately before destruction, and in arriving at the damages the jury should consider the probable yield and the market price, less the expense of production.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 281–283; Dec. Dig. ⚖➡112.]

**15. COURTS ⚖➡6—STATE COURTS—TEXAS—JURISDICTION.**

Where the defendant built a wing dam running from the New Mexico side of a river past the main channel, the courts of Texas have jurisdiction of an action by the owner of property in New Mexico for damages for the flooding of his land caused by the dam.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 13, 15, 17, 22–31; Dec. Dig. ⚖➡6.]

**16. TRIAL ⚖➡139 — INSTRUCTIONS — PEREMPTORY INSTRUCTIONS.**

Where there is a disputed question of fact, the refusal of a peremptory charge is proper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. ⚖➡139.]

**17. COURTS ⚖➡6—STATE COURTS—TEXAS—JURISDICTION.**

Defendant built a dam running from the New Mexico side into the Rio Grande river past the main channel. The river separated Texas from New Mexico. The dam caused the overflowing of New Mexico land. *Held,* that

the courts of Texas had jurisdiction of an action for damages brought by the New Mexico proprietor, notwithstanding the building of the dam caused the main channel to shift to the Texas side of the stream outside of the dam before the overflow occurred.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 13, 15, 17, 22–31; Dec. Dig. ⚖➡6.]

**18. STATES ⚖➡12 — BOUNDARIES — WATER COURSES—CHANGES BY AVULSION.**

*Held,* that notwithstanding the change in the channel of the stream the boundaries between New Mexico and Texas were not altered because the change was by avulsion, hence the Texas courts had jurisdiction.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. ⚖➡12.]

**19. COURTS ⚖➡7—JURISDICTION—LOCAL AND TRANSITORY ACTIONS.**

An action for damages to personalty is transient and not local.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 14, 16, 22–31; Dec. Dig. ⚖➡7.]

**20. WATERS AND WATER COURSES ⚖➡171—FLOODING OF LANDS — LIABILITY — INTERVENING CAUSE.**

Where defendant railroad company built a dam in a natural stream, and the building of the dam, together with a fill by the other defendant, caused flood waters to overflow plaintiff's land, the railroad company was liable, its wrong being concurrent with that of its codefendant.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 216–222; Dec. Dig. ⚖➡171.]

**21. CONTRIBUTION ⚖➡5 — JOINT TORT-FEASORS.**

Where a railroad company's dam and a fill by the other defendant caused a stream to overflow and flood plaintiff's land, the two are joint tort-feasors, and are not entitled to contribution one from the other.

[Ed. Note.—For other cases, see Contribution, Cent. Dig. §§ 6–9; Dec. Dig. ⚖➡5.]

**22. EVIDENCE ⚖➡211—ADMISSIONS.**

Where in a suit against a railroad company and another for damages for the flooding of land, claimed to have been caused by the railroad company's dam and its codefendant's fill, plaintiff as a witness stated that in his opinion the overflow was caused by the fill, there was no such admission of the railroad's nonliability as to warrant the direction of a verdict in its favor.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 738–744; Dec. Dig. ⚖➡211.]

**23. COURTS ⚖➡7—STATE COURTS—JURISDICTION.**

Where the dam of defendant railroad company extended beyond the main channel of a stream separating New Mexico and Texas, the Texas courts have complete jurisdiction over an action brought by a New Mexico proprietor for the flooding of his land by reason of the dam, and are not restricted to a determination of the damage caused by that part of the dam extending beyond the thread of the stream.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 14, 16, 22–31; Dec. Dig. ⚖➡7.]

Appeal from District Court, El Paso County; M. Nagle, Judge.

Action by H. A. Kezer against the Southwestern Portland Cement Company and the El Paso & Southwestern Railroad Company and another. From a judgment against the defendants named, they appeal. Affirmed.

Burges & Burges, Hawkins & Franklin, and W. M. Peticolas, all of El Paso, for appellants. McBroom & Scott, of El Paso, for appellee.

WALTHALL, J. This suit was brought by H. A. Kezer against the Southwestern Portland Cement Company, the El Paso & Southwestern Railroad Company, and the El Paso & Southwestern Railroad Company of Texas for alleged damages to a certain tract of land in New Mexico, and the crops, vegetables, trees, and shrubs, etc., growing thereon, by reason of being flooded by backwater from the Rio Grande river, said water having been caused to back up and flow over said land by the combined action of a dam on the west side of the river, constructed by the defendants Railway Companies, and obstructions on the east side of the river, placed there by the defendant Cement Company.

As a defense, the Railway Companies plead to the jurisdiction of the court, and allege that, if plaintiff suffered any damages, it was on account of the obstructions placed by the Cement Company; two-year statute of limitation; denied liability; and prayed judgment over against the Cement Company.

The Cement Company denies generally that anything done by them caused the flooding of plaintiff's land; that the land was flooded by the excessive headwater flood in the river, and not by backwater; that, if flooded by backwater, a fill in the county road was the cause of the backwater; and, further, that, if flooded by backwater, the embankment of the Railway Companies was the cause; and pleaded two-year limitation. The case was tried by a jury, resulting in a verdict and judgment for plaintiff against the Southwestern Railroad Company for $1,333.33, and against the Cement Company for $2,666.67. Verdict was instructed in favor of Southwestern Railroad Company of Texas, and against the cross-actions, from which this appeal comes to us.

Findings of fact: The plaintiff, in 1907, became the owner of a tract of land on the bank of the Rio Grande river, in the state of New Mexico; and, at the time of the injuries complained of, was residing thereon, and had growing crops of alfalfa, vegetables, and nursery, consisting of young trees, roses, shrubs, etc. The defendant Railroad Company, a resident of El Paso county, Tex., in 1904, for the purpose of protecting the pier of its bridge, on the western bank of the river, constructed a wing dam across the then channel of the river, a portion of said dam reaching into the state of Texas. Said dam was a short distance below the aforesaid property of plaintiff. The result at that time was to change the channel of the river from the west to the east bank thereof. The defendant Cement Company, a corporation domiciled in El Paso county, Tex., at different times prior to 1912 constructed certain fills and dams in the river opposite to the wing dam of the railway company. As a result of the two obstructions, the water was impeded in its flow so that silt therein was permitted to settle in the bed of the river between the said obstructions and the land of plaintiff, and to thereby raise the bed of the river and the water level at all times, and especially at high-water periods, whereby in May, 1912, during flood season of the said river, the waters of the river were caused to back up and to flow over onto plaintiff's land, injuring same and destroying his growing trees, flowers, etc., for the reasonable value of which he recovered judgment.

[1] The appellant Cement Company's first assignment of error raises the question of the application of the statute of limitation of two years to appellee's cause of action. Appellant's contention is that, the Rio Grande being a natural water course, any obstruction thereof by the appellant to the probable injury of appellee was a tort, and limitation began to run from the date of the commission of the tort, and not from the date that injuries might thereafter occur, because thereof. The opposing proposition is that the obstruction placed in the bed of the river was not a trespass or invasion of appellant's rights in the sense of giving him the cause of action pleaded when the obstruction was placed in the river; that the conditions resulting to appellant therefrom were not continuing and constant, but dependent on the contingency of heavy rises in the river; and that the suit was begun within two years after the actual damages alleged occurred.

In support of appellant's proposition, we are referred to Houston Waterworks Co. v. Kennedy, 70 Tex. 233, 8 S. W. 36. In that case suit was brought to recover damages alleged to have resulted from an injury to a house owned by the plaintiff, which he claimed was caused by the making of an arch by the defendant in placing a water pipe in the building, and that in so doing removed a support to one corner of the building, causing the building to settle away from other portions of the building, the walls to crack and burst open in places, thus causing the damage alleged. The suit was not brought in two years after the arch was cut, but was brought within two years after the settling of the corner and cracking of the walls. Judge Stayton, in discussing that case said:

"The action was one that would be barred in two years after the cause of action accrued, and the inquiry is, when did the cause of action accrue? The arch and house alleged to have been injured were the property of the appellee at the time the arch was cut. This was an act wrongful toward the owner of the property, for which an action might have been maintained as soon as the tort was committed. When an act is in itself lawful as to the person who bases an action on injuries subsequently accruing from, and consequent upon, the act, it is held that the cause of action does not accrue until the injury is sustained. * * * If, however, the act of which the injury was the natural sequence was a legal injury, by which is meant an injury giving cause of action by reason of

its being an invasion of a plaintiff's right, be the damage however slight, limitation will run from the time the wrongful act was committed, and will bar an action for any damage resulting from the act, although these may not have been fully developed until within a period less than necessary to complete the bar."

In that case the Supreme Court held that the cause of action accrued when the arch was cut, and would be barred by the statute after two years. The weakening of the arch in that case was an immediate injury, a present invasion of the plaintiff's right; the damage to his house did not depend upon any future contingency. In the case of Austin & N. W. Ry. Co. v. Anderson, 79 Tex. 427, 15 S. W. 484, 23 Am. St. Rep. 350, the Supreme Court of this state discussed and distinguished the Houston Waterworks v. Kennedy Case. In that case the action was brought against the railroad company in 1888 for damages for so constructing its roadbed and culverts, in 1881, as to change the natural flow of the surface water, from ordinary rains, cause it to be collected in large quantities, and to be carried in large volumes down to and through certain culverts upon plaintiff's land, submerge it, washing away the soil, remaining on it for a long time, and causing the damage complained of. The injury was done in 1886, 1887, and 1888. It was contended that the cause of action arose when the culverts and roadbed were constructed in 1881. The court, after quoting from Judge Stayton's opinion in the Houston Waterworks v. Kennedy Case, said that "the weakening of the arch was an immediate injury—an immediate invasion of the rights of the plaintiff." The court quoted with approval and applied the principle announced in Powers v. City of Council Bluffs, 45 Iowa, 652, 24 Am. Rep. 792, a suit for damages by reason of a ditch dug by the city to carry away a running stream of water along a street, the constant action of the water causing the injury to plaintiff's land, in which it was held that no suit could be maintained until some actual injury to plaintiff was caused by the action of the water resulting from the improper construction of the ditch. The court said that the building of the roadbed and culverts was no invasion of plaintiff's rights; they were not put on his land; they became a nuisance only at intervals by diverting the water from rainfalls from its usual flow upon plaintiff's land. The embankment and the culverts were permanent, but the nuisance was not. There was no constant and continuing injury. In the case of Ry. Co. v. Graham, 12 Tex. Civ. App. 56, 33 S. W. 577, the court said:

"The well-settled rule upon this subject in this state is that, if the structure is such as to occasion damage only at times, the injured party may sue separately for each injury he received; but, if the damage produced is continuing and permanent in its nature, he may and must obtain the redress in one action. * * * As alleged and proved in this case, the dam worked a constant injury to the land from the beginning. It created a permanent status of injury to the freehold from the time of its construction. As a result, limitation will run on such a demand from the time the injury was instituted."

In the case of International & G. N. Ry. Co. v. Kyle, 101 S. W. 272, the court held that the building of an embankment by a railroad company is not of itself a nuisance or an invasion of plaintiff's rights, but becomes so only at intervals by diverting water from rainfalls from its usual flow upon plaintiff's land; the cause of action arises upon receipt of such injury, and successive actions may be brought for each injury as it occurs, and an action for such injury would not be barred by the statute until two years thereafter.

It seems to us to be well settled that it is only when there is an immediate trespass or invasion of the landowner's right sufficient to constitute a present cause of action, or a continuing and permanent nuisance, that puts the statute of limitation in motion. The proof in the case did not show such condition, but did show that the obstructions were some distance below appellee's land; that the overflow causing the damage complained of was not immediate or continuous, and that appellee was not in the least affected by the constructions placed in the river until 1912. The assignment is overruled.

[2, 3] Appellant Cement Company's second assignment of error is to the ruling of the court in permitting the plaintiff, Kezer, to testify over objection "as to the probable yield in trees, plants, vines, shrubs, flowers, and vegetables per acre of his farm," and under this assignment appellant presents four propositions: First, want of knowledge, by experience or otherwise, of productiveness of tomato plants, per plant or per acre; second, no allegation in the petition as to probable yield of tomato plants; third, there being no evidence that the tomato plants had reached such stage of development that a reasonably fair estimate could be made of their production; and, fourth, the evidence as to the probable yield was uncertain and speculative.

There seems to have been some uncertainty as to whether appellant objected to the evidence on the ground that the witness had not qualified to testify as to the probable yield of tomatoes, and the court qualified the bill of exceptions with the statement that he did not understand the appellant to object on that ground, and attaches a transcript from the record as to what really occurred. The record is not clear as to whether objection was made to the evidence on the ground stated in the bill. As the item of damages for tomatoes amounted to quite a sum, we prefer to consider the assignment and the propositions thereunder, although the brief does not show that an exception was taken to the court's ruling, nor otherwise comply with the rules for briefing cases.

The record shows that the witness had testified that he had been engaged in business as florist and gardener in the cultivation and production of fruit trees, vegetables, etc., since 1897; had made a study of it all his life, and had done nothing else since 1887, and for more than one season on that very ground. All that would be necessary to admit his evidence to go to the jury would be to show that he had such experience, understanding, or knowledge of the facts about which he testifies as to enable him to arrive at an intelligent opinion as to the probable yield in trees, plants, shrubs, flowers, and vegetables on a given area. We do not think it would be necessary, before the hearing of the witness' evidence as to a probable yield, that he should previously have tested the productiveness of similar trees, plants, shrubs, flowers, and vegetables either per plant or for a given area. The first proposition under the second assignment of error is overruled. The second proposition is not germane to the assignment, and cannot be considered. Ry. Co. v. Miller, 88 S. W. 499; Insurance Co. v. Sadau, 167 S. W. 334; Ford Motor Co. v. Freeman, 168 S. W. 80. We are of the opinion that Ry. Co. v. Pape, 73 Tex. 501, 11 S. W. 527, and American, etc., Co. v. Mercedes, etc., Co., 155 S. W. 299, settle the third and fourth propositions presented adversely to appellant's contention, and they are overruled.

[4] Appellant Cement Company's third assignment of error is that, there being no allegation in plaintiff's petition as to the probable number of blossoms that would be produced by a rose plant and other flower plants, the defendant was not advised of the issue it would be expected to meet, and the evidence, not being responsive to any issue raised, was inadmissible. We have already made a brief statement of the pleadings, and it is unnecessary to restate them here. The court permitted the plaintiff, Kezer, to testify as to the number of flowers each variety of rose plant or bush would produce, and the wholesale price per flower at which each variety would have sold. The court, in the charge to the jury, submitted the measure of damage on this issue as follows:

"If you find from the evidence that the plaintiff had growing crops of vegetables, flowers, or nursery trees, shrubs, or plants, including many vegetables, if any, that you find were growing on any part of said orchard and land, and that any of said crops were destroyed by said flood, then as to so much of said crop of vegetables, flowers, and nursery trees, shrubs or plants, or any of them, as were destroyed by said flood, you are charged that the measure of plaintiff's damages, if any, to such crop of vegetables, flowers, and nursery stock or plants, shrubs, or any of them that you find were destroyed by said flood, if any, is the value of such crops, if any, as were destroyed at the time, place, and condition in which they were immediately before said flood. And in arriving at the value of said growing crops of vegetables, flowers, and nursery stock, shrubs, or plants at said time and place, and in the condition in which they then were, you will take into consideration the amount of probable yield of said crops of vegetables, flowers, and nursery stock or plants and shrubs during said year, had they not been destroyed by said flood, if they were so destroyed, and the reasonable market value of such probable yield thereon at El Paso, Texas, at the time of the normal harvest thereof, less the cost of expense of completing the cultivation, gathering, and marketing thereof, including all expenses that would have been incurred by said plaintiff in every particular, from the beginning of said flood until all of said crop would have been marketed, and less the reasonable market value of such crops and products as plaintiffs thereafter produced or was thereafter able to produce on said land during said year."

It will be seen from the facts stated in the petition and the issues of fact submitted to the jury in the court's charge quoted that the damages claimed and the measure of plaintiff's damages, as to the rose plants, is based on the value of the plants destroyed by the flood, and not on the number of roses on each plant, but that the jury could, in estimating the value of the plant, consider their probable yield in flowers and the probable value of such yield. We think that, when the cause of action stated in the pleading is based on the destruction of the rose plants or shrubs themselves, and not on the destruction of the flowers or blossoms which the plants would probably have produced, it would not be necessary to state the probable number of blossoms or flowers which the plants would yield in order to introduce evidence as to their probable yield. The issuable fact pleaded and submitted was the damage resulting to plaintiff from the destruction of the shrubs or plants, and the proof of their probable yield in flowers and their value was only evidence to show the value of the plant. The third assignment is overruled.

[5] Appellant's fourth assignment claims error in permitting plaintiff, over objections, to state the intrinsic or market value of shade or ornamental trees when they were two years old, it having been shown that those destroyed were from cuttings rooted in the fall of 1911. The bill of exceptions shows that the objection to the evidence was on the ground that the evidence was speculative.

The plaintiff testified that the trees would have been two years old when offered for sale, and would have been worth 50 cents each. They were nursery trees, and the trees he shipped to other markets were sold with reference to their value on the El Paso market. There was no market value for nursery stock, ornamental trees, flowers, vegetables, etc., as they grew on the ground, in the sense that a man would buy them as they existed on the ground. The market value of these trees in December, 1912, in El Paso, Tex., would have been 50 cents each, and there was a good demand for them. The shipments to Douglas and Bisbee were f. o. b. cars El Paso. He stated the expense of growing and putting the trees on the market.

The witness had sufficiently qualified to speak as to value of the trees and the market. He was in the business a short distance from

El Paso, which included the growing of the trees for the El Paso market. We do not think the evidence was open to the objection that it was speculative. It seems to us clearly admissible over any objection that could have been urged. The assignment is overruled.

Appellant's fifth assignment is without merit and is overruled.

Our ruling upon the third and previous assignments disposes of assignments of error Nos. 6, 7, 8, 9, and 10.

[6] Appellant Cement Company's eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, and seventeenth assignments of error question the ruling of the trial court in permitting the plaintiff to testify as to what caused the overflow of his land, and in assigning the overflow to the obstructions placed in the river, on the ground that the witness did not possess sufficient knowledge of the physical facts upon which to base an opinion. The appellee testified that during the 13 years he had owned the land he had hauled and put on the land a great deal of lime and manure, bone, etc.; that he commenced to work on the place as soon as he got it, and had worked on and increased the cultivated area of it from year to year, and did the planting of the nursery trees, orchard, vineyard; had on the land a general flower and vegetable garden; had been acquainted with the river many years, coming to El Paso in 1888; kept track of the land since that time; had lived on the bank of the river since 1887, and noticed it at the point of his land nearly every month, often every week, and paying particular attention to it during periods of high water. After the high water in 1897, had made observations of this land and river, took up his residence on the land in 1900, and cultivated it and spent most of his time on it, and kept a close watch on the river, putting up ford gage; kept track of its flow and the scouring of the river bed. Detailed where the river channel was during the different years. Witness' evidence is too lengthy to state here, but it showed a thorough familiarity with the rises, the currents, and actions of the water in the river in the vicinity of his land, through a period of many years, and had observed the action of the river when the obstructions were placed in the bed. During the flood of 1912, that overflowed his land, he had a number of men working with him in making a levee, and they worked several days. On May 28th, at 9 o'clock, the water broke in at his southeast corner. He was not there at that time as he was working farther upstream. (He then detailed the action of the water and the current on his land.) The witness testified that prior to the time the obstructions were put in the river, when there was a freshet, the bed would scour; but if it had been only a little rise then, when the river went down, the bed would show to be higher than before. In speaking of the supposed channel, where the Cement Company made its fill, the witness stated:

"That was the deepest part of the main channel of the river, and a little farther in there were some sand hills, but it would flow back of them. * * * The wing dam was about five feet high and was built in 1904. The big hole that I spoke of in the channel of the river was little northeast of the tent houses. The water there was sufficiently deep to be over the head of a grown man."

Witness was asked the question what in his opinion was the cause of the flood on his land in May, 1912. Over objection of the Cement Company, the witness was permitted to testify as follows:

"The direct cause, in my opinion, was the filling in of the river by the Southwestern Portland Cement Company, where the sales office, boarding house, tent houses, and little stables now stand."

This fill was from 80 to 130 feet in width. Appellant's contention under these assignments substantially is that before a witness, not testifying as an expert, will be permitted to state his opinion as evidence as to what caused a given result, he must show himself possessed of knowledge or information as to facts and circumstances controlling such result, and the witness (plaintiff) not having been shown to possess such information, either before or after the placing of the alleged obstructions in the bed of the river, it was error to permit the witness to state his opinion as to what caused the overflow. The suggestion is that before the witness could be heard to express his opinion as to the cause of the overflow, he, not testifying as an expert, must show a knowledge of the carrying capacity of the river at that point, must know the height or length of the obstruction placed in the river, the depth, width, and carrying capacity of the channel and bed of the river either before or after the placing of the obstructions in the bed.

We do not think the trial court abused its discretion in permitting the witness to state to the jury his opinion as to what caused the overflow on his land, on any of the grounds stated. After the witness has stated his observations on the action of the river in a number of rises in the river before and after the placing of the obstruction in its bed and channel, and has given the facts upon which his opinion is based, and where the facts stated appear to be such as would enable him to arrive at an intelligent opinion with respect to the subject about which his opinion is given, it then becomes a question of weight to be given to the opinion or conclusion expressed. It then becomes a matter of discretion with the trial court, after the witness has detailed all of the facts with respect to the matter about which he is being interrogated, whether the witness may then state his opinion as to a given result. No definite and fixed rule can be stated as to when a witness should be permitted to state his opinion. The case of Ry. Co. v. Harbison, 88 S. W. 452, to which we are referred, is very sim-

ilar to the case before us in many of its facts. In that case the trial court excluded the opinion of the witness when asked: "Would any damage by waste to Harbison's land have been caused by the railroad dam and embankment?" And the answer was: "I think not. That is my opinion. I don't know. I don't see how it could." In that case, the witness had shown familiarity with the location complained of, had observed the same for many years prior to the injury, and had noted and observed the effect of overflows on the lands and lands adjacent before and after the railroad was built; but the court concluded there was no error in excluding the evidence, as it did not appear that the witness was familiar with the embankment and dam, or the length or height thereof, or the area of the waterways, the drainage area, or character or sign of the culverts or openings in the embankments, dam, or culverts to carry off the water. It was simply a question of abuse of discretion in excluding the evidence. If the court in the present case had excluded instead of admitted the evidence, it might still be held that there was no reversible error. Guerra v. San Antonio Sewer Pipe Co., 163 S. W. 669; G. C. & S. F. Ry. Co. v. Norfleet, 78 Tex. 321, 14 S. W. 703; Byrd Irrigation Co. v. Smyth, 157 S. W. 260.

[7] Appellant Cement Company's eighteenth, nineteenth, and twentieth assignments of error complain of the action of the court in permitting the witness J. W. Eubank to state that his opinion was that the overflow of the Kezer land was caused by obstructions placed in the river at and near the cement plant; because, as claimed by appellant, the witness had testified that he made no observations of anything in the way of levels or measurements of the channel, and had no knowledge of the physical facts affecting the flow of the river either before or after the placing of the obstructions in the river, and had no knowledge at any time of the carrying capacity of the channel of the river either above or below or at the point of the obstructions, and, that from a want of such knowledge, it was error to permit the witness to testify what, in his opinion, caused the overflow of plaintiff's land.

After the plaintiff had examined the witness, and the evidence objected to had been stated, the witness was cross-examined by the attorneys for the railroad companies, when he again made the same statement as to what, in his opinion, caused the overflow. The record does not show that appellant Cement Company objected to this statement. The witness was then examined and at some length by attorneys for the Cement Company, using photograph and maps used as exhibits on the trial. The record is entirely too lengthy to state it here. The witness stated that he had been familiar with the river and its characteristics; for many years knew the location of the plant of the Cement Company;

saw the dirt and slate when it was being put in the river; knew the location of plaintiff's land, and had a general knowledge of the formation of the river bed, banks, etc., between plaintiff's place and points mentioned below the Cement Company's plant, and had observed the river at those points for many years. Witness had charge of the public roads at the time of the flood in 1912, and was on the ground at the points discussed during the time the flood was at its height; was putting in some riprap and watched the river closely. The witness stated that from his observation of the river at other times and his acquaintance with the conditions, his observations of the flood of 1912 during its heights, he was able to form an opinion as to what caused the water to back up on plaintiff's land. One of the bills of exception covered by the eighteenth assignment the trial court signed with the qualification that the witness Eubank was conceded to be an engineer, and deemed by the court qualified to express an opinion. The cross-examination of the witness, it seems to us, discloses that the witness was well qualified to express an opinion from his personal observations of the action of the water in different floods at the points discussed. It is true that the witness stated that he "was not acquainted, by measurement, with the carrying capacity of the river between the Southern Pacific bridge and the Courchesne bridge, at any point (between which points is the Cement Company's plant)." We think there was no abuse of discretion shown in permitting the witness to express the opinion stated and the assignments are overruled.

[8] Appellant Cement Company's twenty-first and twenty-second assignments complain of the action of the court in permitting the witness Albro to express his opinion that the obstructions placed in the river by the Cement Company caused the overflow of plaintiff's land, because the witness not having shown knowledge of the physical facts with reference to the measurements of the obstructions, the measurements of the channel and bed of the river, nor the carrying capacity of the channel or bed, and not having shown any knowledge of the characteristics and action of the river in flood times, or knowledge of the carrying capacity of the river either above or below the point of the obstructions, he should not be heard to express an opinion. The witness was introduced as an expert civil engineer. Had surveyed and platted plaintiff's place, and made map of the locality. Stated that he was familiar with the river from the Courchesne bridge to the Southern Pacific bridge, and heard the evidence of the witnesses as to the obstructions placed in the river, and from his personal information and what he had heard stated had an opinion. From hypothetical questions embracing the facts testified to, the witness expressed the opinion that the over-

flow was caused by the obstructions placed in the river. We think there was no error in permitting the witness to testify.

Appellant Cement Company's twenty-third, twenty-fourth, and twenty-fifth assignments of error complain of the eighth paragraph of the court's charge, in that it is claimed that said paragraph instructed the jury that, in considering the damage, the jury might take into consideration the combined effect upon the flow of the waters of the river of the obstruction built by it and the wing dam built by its codefendants. The eighth paragraph of the court's charge, we think, is not subject to the criticisms made in the assignments, and they are overruled.

[9, 10] Appellant Cement Company's twenty-sixth assignment complains that the charge of the court, as a whole, did not submit the matters of defense as pleaded by defendant Cement Company with reference to natural causes and obstructions occurring and placed in the river above the lands of defendant and on the east bank of the river opposite the lands of plaintiff by the county in the construction of its road, and appellant claims that it sought to remedy the matter complained of by requesting special charges, which were refused by the court.

The supplemental charge of the court given in lieu of special charge No. 5, asked by defendant Cement Company, in connection with the general charge and requested special charges given, presented the issues to the jury as fully as was necessary, and precluded the necessity of any additional charge presenting the same issue. Said supplemental charge is as follows:

"You are charged in lieu of special charge No. 5, asked by defendant Southwestern Portland Cement Company, that in the event you believe from the evidence that the defendant Cement Company placed obstructions in the flood channel and bed of the river passes the land of said defendant Cement Company, but you further believe from the evidence that the flooding of plaintiff's land, if any, in the year 1912, was not proximately caused, either in whole or in part, by such obstructions, if any, but that same was caused in whole by any other cause or causes, natural or artificial, formed above said obstruction so placed in the river by said defendant Cement Company, or elsewhere, if any was so placed, or by the natural flow of the river and volume of water passing in the channel thereof, at the time of plaintiff's alleged damage, and that plaintiff would have sustained all the damage he did sustain, if he sustained damage, even though such obstruction, if any, had not been in said river, then, in that event, if you so find, the plaintiff would not be entitled to recover against said defendant Cement Company, and in such event you will find your verdict in favor of the said defendant Southwestern Portland Cement Company."

For reasons stated in passing upon the last assignment, appellant's assignment 26½ is overruled.

In appellant Cement Company's twenty-seventh assignment complaint is made that the court erred in refusing its special charge No. 2, to the effect that, had there been no obstruction in the river in the vicinity of the lands of defendant at the time of the 1912 flood, plaintiff's land would nevertheless have overflowed, the verdict must be for defendant.

The court gave defendant's special charge No. 4, and a special charge in lieu of defendant's special charge No. 13, which we think sufficiently presented the issue, and the assignment is overruled.

Appellant Cement Company's assignments twenty-eighth, twenty-ninth, thirtieth, and thirty-first assign error based upon the refusal of the court to give special charges requested. We have carefully examined defendant's pleading submitting the issues there presented to the effect that, if plaintiff's land was overflowed by reason of backwater, same was caused by natural causes, in that the channel and bed of the river at and near the lower end of plaintiff's land is narrow and turned at an abrupt angle, and thereby retarded in its movement. The statements of the defendant under these assignments do not refer to any evidence on the issues tending to show that the overflow of plaintiff's land was from any of the natural causes pleaded, but the statements show only that such defenses were pleaded, and the special charges requested presenting such issues to the jury. However, we believe that the court's charge given in lieu of defendant's special charge No. 5, quoted above, sufficiently and properly presented the issues to the jury. The assignments are overruled.

[11] The thirty-second assignment of appellant Cement Company suggests error in refusing to give defendant's special charge No. 11, instructing them that in the event they assessed damages as sustained to the plaintiff's real estate, and also as sustained by plaintiff's personal property, the jury would state the damage to each separately. The contention of defendant is that the influence that caused the injury to plaintiff was such that it might recur at any time; that the evidence showed that a part of the land was left entirely worthless; that if the judgment shall be paid, plaintiff will have been compensated for his land; should plaintiff rebuild or revivify it by giving it a new value, the defendant could not again be called upon to pay for the land in full; that, the plaintiff having been compensated in damages for the full value of the land, it would be as though taken under condemnation proceedings, and defendant could not be held for another and later destruction of the same land.

We think the twelfth paragraph of the court's general charge did so instruct the jury. In that paragraph the court submitted to the jury the measure of damages for any injury plaintiff might have sustained as to his land, the measure of damage he might have sustained as to any part or all of any crop or personal effects, and gave the measure of damage separately for each. True, the verdict of the jury did not return separate amounts for each, if they assessed damages

for each. We do not understand that the verdict returned should state separate amounts. Ry. Co. v. Pape, 73 Tex. 501, 11 S. W. 526.

[12] The Cement Company's thirty-third assignment claims error in the court's refusal to give a peremptory instruction in its favor. The court was not in error in so refusing. The questions involved have been passed upon in discussing other assignments, and it is overruled.

[13] Appellant Cement Company's thirty fourth, thirty-fifth, and thirty-sixth assignments of error complain that the court was in error in giving the jury the rule for the measure of damages contained in the twelfth paragraph of its charge, because the pleading of the plaintiff did not seek to recover damages according to the measure of the rule stated. It was not necessary that the petition should have alleged a measure of damages. The pleadings alleged in separate items the several items of property destroyed or injured by the overflow, and the amount of damages claimed for each item as the result. St. L. S. W. Ry. Co. v. Jenkins, 89 S. W. 1106; San Antonio v. Pizzini, 58 S. W. 635; Ry. Co. v. Glover, 84 S. W. 604. We have carefully read the cases to which we are referred by appellant. They do not sustain the proposition contained in the assignment. The assignments are overruled.

[14] The proposition announced in appellant's thirty-seventh assignment, complaining of the court's charge in permitting the jury to take into consideration, in arriving at the amount of plaintiff's damages, what would have been the probable value in 1912 of the yield in plants, flowers, etc., for that year, as being speculative, has been discussed, and determined under other assignments. The court charged the jury that the measure of damages for such growing crops as were destroyed was the value thereof at the time, place, and condition in which they were immediately before the flood that destroyed them, and that in arriving at such value at such time and place, and in such condition, they would take into consideration the probable yield, but for their destruction, and the reasonable market value of such probable yield at El Paso at the time of the normal harvest thereof, less every cost and expense of production and marketing. We think the cases referred to sustain the measure of damages stated in charge.

Assignments of error from the thirty-eighth to and including the forty-fifth, on separate and distinct grounds stated, complain of the verdict and judgment as being contrary to the law and the evidence, and error in admitting evidence; but each one of the matters complained of were properly submitted to and determined by the jury, and the questions presented have been considered under other assignments, and we need not again discuss them. The evidence, it seems to us, was sufficient to support the verdict and judgment. The assignments are overruled.

[15, 16] Appellant El Paso & Southwestern Railroad Company's first assignment of error complains of the refusal of the trial court to give its second special charge requested, it being a peremptory charge, and the ground on which the charge is based is that the court was without jurisdiction as to defendant Railroad Company, the loss and damage being in New Mexico, the obstructions placed in the river being in New Mexico, and the action was local. Plaintiffs alleged that in 1904 the defendant Railroad Company built the dam a short distance below the property of plaintiff, and extended the dam beyond the middle of the bed of the river, and still maintains same. This the defendant denied, and it became an issue of fact to be submitted to the jury. The court was not in error in refusing to give to the jury the peremptory charge requested, with the undetermined issue of fact of the extension of the dam into this state remaining in the pleadings and on which proof was offered.

[17] Appellant's second assignment complains of the following charge given by the trial court, which is as follows:

"The defendant El Paso & Southwestern Railroad Company, amongst other defenses, alleges that no part of the dam or embankment which it is charged with having constructed or caused to be constructed from the west bank of the Rio Grande river out into the river at the time of its construction or since extended into the state of Texas, and that for that reason this court has no jurisdiction over said defendant.

"You are instructed that under the law an action for damages to real estate cannot be maintained in the courts of the state of Texas unless the act, or some part of the act, causing such damage to such real estate, was done in the state of Texas.

"You are therefore instructed that if you believe and find from the evidence that the dam or embankment which defendant El Paso & Southwestern Railroad Company is charged with having constructed or caused to be constructed at the time of its construction did not extend from the western bank of the Rio Grande river beyond the middle of the main channel of said Rio Grande river as it then existed, you cannot in such event, if you so find, hold the defendant El Paso & Southwestern Railroad Company liable for any damages to the real estate of plaintiff, no matter what you may otherwise think as to whether or not the said defendant El Paso & Southwestern Railroad Company would be otherwise liable; but you are instructed as to any damage to plaintiff's personal property, if any, the fact of whether the dam, which defendant El Paso & Southwestern Railroad Company is charged with constructing, did or did not extend into the state of Texas, would in no wise affect its liability, in the event you find from the evidence that said defendant did construct or cause to be constructed the said dam and is otherwise liable to plaintiff."

The particular error in said charge insisted upon is that it made the condition and location of the wing dam, at the time of its erection in 1904, the test of whether it was in New Mexico or Texas, when, it is claimed, the test should have been as to its condition

and location at the time of the flood causing the damage.

It will be observed from the charge quoted that the trial court submitted to the jury the question of fact, and made the liability of appellant for damages in this suit to the real estate depend upon the question as to whether the wing dam, when constructed in 1904, extended from the west bank of the river beyond the main channel of the river, so as to show the construction of a part of it in this state. The witness Bonner, who helped build the dam, testified that:

"We were riprapping the piers of the Southwestern bridge to take care of the current that swung around to the west there. At that time the main current and channel of the river was next to the west bank. That was the deepest and swiftest water. There was very little shallow, sluggish water on the western side; * * * the dam extended out into the river from 150 to 200 feet."

If any damages to plaintiff's real estate is incorporated in the verdict of $1,333.33 found against appellant, the jury must have found that the wing dam at the time of its construction did extend from the western bank of the river beyond the middle of the main channel of the river as it then existed. The finding by the jury of the one fact against appellant Railroad Company, that all of the wing dam put in the bed of the river by defendant in 1904 was not in New Mexico, but a part of it at least was in Texas, under the view of the law as expressed by the trial court in the charge quoted, would make the defendant Railroad Company liable in this suit in 1912 for damages to the real estate of plaintiff in New Mexico, regardless of any effect the wing dam might have had in changing or fixing the main channel of the river at that point in 1912. The plaintiff, Kezer, testified that the wing dam "caused the channel of the river to be turned to the east in 1905; * * * subsequently to 1905 the main channel had been diverted, and ran along over to the east; * * * referring to the map, the main channel of the river now (1913) was to the east as shown on the map."

Should the test of the trial court's jurisdiction to award damages for injury to plaintiff's land in New Mexico depend upon the location of the wing dam with reference to the center of the main channel of the Rio Grande river in 1904 or in 1912? Did the fact that the placing of the wing dam in the river had the effect to turn the center of the main channel of the river so that in 1912 it ran east of the wing dam have the effect to change the boundary line between Texas and New Mexico and place the wing dam entirely in New Mexico?

The Supreme Court of this state in the case of Armendiaz v. Stillman, 54 Tex. 623, held, first, that our statute fixing the venue of suits for damages to land in the county where the land lies has reference to actions for damages to lands in some county in this state; second, that where the damage and the act causing it both take place beyond the jurisdiction of the Texas court, the action cannot be maintained; and, third, that where an obstruction had been wrongfully placed in the Rio Grande river in Cameron county, Tex., which caused the current of the river to flow against and upon land on the Mexican side of the river, thereby causing damage to the land in Mexico, a suit for the damage could be maintained in the Texas court. Neither appellant nor appellee has referred us to a case where the facts are similar to the case at bar. We do not believe that the wrongful placing of an artificial obstruction in the bed of a river which is the boundary line between two countries or states, without the consent or authority of either or both, by any citizen of his own accord, could have the effect to change the boundary line theretofore fixed by the governing body whose duty and privilege it was to fix the boundary, although it may have the temporary effect to change the bed or the center of the main channel of the river and put one or both at a different place to where they formerly were. But suppose the boundary line between New Mexico and Texas could be so changed, the inquiry would still arise as to whether the change in location of the center of the main channel of the river was by avulsion or by alluvian.

[18] The change in the channel of the river was evidently by avulsion, which would have no effect to change the boundary between New Mexico and Texas. It is well settled that, where a stream which is a boundary from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary, and that the boundary remains as it was, at the center of the old channel, although no water may be flowing therein.

Mr. Gould on Waters, § 159, says that:

"If the damage is violent and visible and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates."

To the same effect is Angell, Water Courses, § 60; Trustees of Hopkins Academy v. Dickinson, 9 Cush. (Mass.) 544; Buttenuth v. St. Louis Bridge Co., 123 Ill. 535, 17 N. E. 439, 5 Am. St. Rep. 545; Denny et al. v. Cotton et al., 3 Tex. Civ. App. 634, 22 S. W. 122; Marks v. Sambrano, 170 S. W. 546. Such seems to be the received rule of the law of nations on this point, as laid down by all of the writers of authority.

In the case of State of Nebraska v. State of Iowa, 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186, Justice Brewer says:

"These propositions, which are universally recognized as correct where the boundaries of private property touch on streams, are in like manner recognized when the boundaries between states or nations are, by prescription or treaty, found in running water. * * * Avulsion has no effect on boundary, but leaves it in the center of the old channel."

It was not the territorial location of the dam in 1912 with reference to the channel of

the river as it ran when the damage was suffered that determined the question of venue, but it is the location of it in 1904, before its diversion. The assignment is overruled.

[19] Appellant, in its third assignment of error, insists that the action, both as to the damage affecting the land and the damages which the court construed to be personalty in its charge, was a local action, one which could happen at the one place, in New Mexico, and the court had no jurisdiction. If we have held correctly in passing upon appellant's second assignment, the same authorities there used are in point on the third assignment—an action for damages to personal property is transient and not local. Missouri Pacific Railway Company v. Cullers, 81 Tex. 387, 17 S. W. 19, 13 L. R. A. 542; Silberberg v. Trilling, 82 Tex. 523, 18 S. W. 591. The assignment is overruled.

[20] Appellant, in its fourth and fifth assignments, which can be discussed as one, asserts error in the trial court in refusing to give its special charges in which the jury are instructed that should they believe that, but for the fill made by the Cement Company, no damage would have resulted to plaintiff by the flood of 1912, to find for appellant. The Cement Company's fill was made subsequent to that of the Railroad Company, and in 1905, before the Cement Company's fill was put in the river, a larger volume of water passed, according to the government gage, than passed in 1912, and without injury to plaintiff. The court told the jury that, if the obstructions placed in the river by each of defendants acted together to cause the overflow, they would apportion the damages as they found the damages to result from their acts respectively.

If the appellant, by building the wing dam in the bed of the river, put in operation a force or cause likely to prove injurious to another, it is liable for its natural and proximate effects, which may be immediate and direct or through the media of natural forces or other causes. The number and variety of the media are immaterial. It is the law that, when an event is followed in natural sequence by a result it is adapted to produce or aid in producing, the result is deemed the consequence of the event. The proposition asserted in the assignment, that another intervening cause produced the result complained of, presents one of the most difficult subjects law writers have to deal with. In considering it we enter on one of the most metaphysical branches of the law, and in which entire harmony in its application cannot be expected and is not found, growing out of temperamental differences which influence those who are to make the application. The earlier writers on the law involved in the proposition seem to imply that the producing cause of an injurious result was necessarily single, that some one predominating cause always existed and was always capable of being ascertained, and hence selection must be between concurrent causes and between an original and a supervening cause. Such, however, is not the law. Many causes may contribute to the same result, all concurring and supervening. It has been said that the last link in the chain of causation may itself be actionable, but not on this account is responsibility for the original cause to be avoided, unless the last cause was wholly independent of the first, not produced by it, could not reasonably have been foreseen and is itself an adequate one, and without which the result would not have occurred, and so breaks the chain of causation. If the result produced can be referred to the last cause, as intervening between the first cause and the result, and so as not to borrow any resultant effect from the first cause, the law will attribute the result to it. The charge requested would eliminate and withdraw from the consideration of the jury any issue of fact as to whether the wing dam put in by the railroad company was a contributing proximate cause of the damage.

In the case of Mexican National Railway Company v. Mussette, 86 Tex. 708, 26 S. W. 1075, 24 L. R. A. 642, Judge Stayton quoted with approval from Lane v. Atlantic Works, 111 Mass. 139, these words:

"The act of a third person intervening and contributing a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise. Whether in any given case the act charged was negligent, and whether the injury suffered was within the relation of cause and effect, * * * are questions for the jury."

We believe that the plaintiff had the right to have submitted to the jury the question as to whether the negligent acts of each of the defendants in placing obstructions in the river were simultaneous and concurrent in causing the overflow of his land. Gonzales v. City of Galveston, 84 Tex. 3, 19 S. W. 284, 31 Am. St. Rep. 17; Jones v. George, 61 Tex. 346, 48 Am. Rep. 280.

Appellant's fourth and fifth assignments are overruled.

[21] Appellant's sixth assignment of error is based on the peremptory instruction of the court to the jury to find against defendant Railroad Company on its cross-action against the defendant Cement Company, and in not submitting the issue to the jury. The facts do not show this to be a case where the doctrine of contribution and indemnity between wrongdoers can be invoked. It is well settled that no man can make his own wrongdoing the ground for an action in his own favor. If appellant Railroad Company was guilty of such wrong as to authorize a recovery against it, it cannot recover against its codefendant as joint tort-feasor. We think the following authorities sustain the

action of the court: Cooley on Torts (3d Ed.) vol. 1, p. 254; Ry. Co. v. Vance, 41 S. W. 167; Ry. Co. v. Nass, 94 Tex. 255, 59 S. W. 870; Consolidated, etc., Smelting Co. v. Binkley, 45 Tex. Civ. App. 100, 99 S. W. 181.

[22] Appellant Railroad Company's seventh assignment is to the effect that because the plaintiff, Kezer, testified that after the wing dam was put in the river in 1904 the channel carried all of the water that came down in the flood of 1905, after it washed around the obstruction and after that had washed out, the water receded from his place. Subsequent to that time, the Cement Company put·in the fill (about 1909), and after that was put in his land was overflowed with a smaller volume of water, and which overflow, in his opinion, was caused by the fill of the Cement Company. On the above statement of plaintiff, the Railroad Company submitted a peremptory instruction as to it, which was refused.

It seems to us that the opinion of the plaintiff might have stated the fact as it really was;. that is, that if the Cement Company's fill had not been put in, the wing dam alone would not have been a sufficient obstruction to cause the overflow of his land, and yet the two causes acting together did have that effect. The issue tendered · by plaintiff, and on which the case was submitted to the jury, was that the wing dam put in by the Railroad Company and the fill put in by the Cement Company had the effect to cause the overflow. The court submitted the issue to the jury as to whether the wing dam in connection with the fill was a proximate cause of the overflow. The opinion of the plaintiff given in evidence is like the opinions of any other witness. If the Railroad Company had been the only defendant in the case, and the wing dam the only obstruction in the river, if there was other evidence to the effect that the wing dam was the proximate cause of the overflow of plaintiff's land, sufficient to require the issue to be submitted to the jury, it would be the duty of the court to submit it. If the plaintiff in his pleading had admitted the fact to be that the fill put in the river by the Cement Company was the sole proximate cause of the overflow, or had in open court admitted such to be the fact, such admission would have had the effect to withdraw the issue from the jury and there would have been no issue of fact to submit. But the opinion of the plaintiff as a witness to the effect that the overflow was caused by the fill put in by the Cement Company is not such admission. It is not even an opinion of the witness that the wing dam was not a concurring cause. The assignment is overruled.

We have discussed the issues presented by the eighth, ninth, tenth, and eleventh assignments elsewhere in this opinion and they are overruled.

[23] Appellant Railroad Company's twelfth assignment complains of the trial court's error in refusing to submit its special charges 5, 6, 7, 8, and 9, in which the jury were told that the only portion of the Railroad Company's wing dam which they could consider in determining its liability was such portion as extended easterly beyond the center line of the main channel, that being the only portion in Texas, and the only portion, if it caused damage, over which the court had jurisdiction. The special charges are copied in the brief, and they in different ways present but one issue, stated in the assignment. Neither the assignment nor the proposition thereunder presents a correct proposition of law. If a part of the Railroad Company's wing dam was built in Texas, so as to give the court jurisdiction to try the cause as any part of the damage to the real estate, the court could hear the entire cause, and the jury could consider the entire producing or proximate cause of the damage. Armendiaz v. Stillman, ·54 Tex. 623. Appellant has referred us to no case sustaining his contention that the court could have jurisdiction over the action for damage to real estate only in proportion to the distance the wing dam built in Texas would sustain to the entire length of it, and that the courts in New Mexico would have jurisdiction over the other part, and we think that no case so holding can be found. The assignment is overruled.

Finding no error, the case is affirmed.

### On Rehearing.

HARPER, J. In its motion for rehearing, the appellant Railway Company suggests that the court erred, in passing upon its second assignment of error, in stating that "the change in the channel of the river was evidently by avulsion, which would have no effect to change the boundary between New Mexico and Texas." This criticism, in my opinion, is correct, and this observation in the opinion should be withdrawn, for the reason that the question was not before the trial court, no pleadings and no evidence adduced there, with a view to establishing that point, nor is the question in any wise raised by the briefs of the parties filed here; and for the further reason that, in my opinion, the charge of the court complained of in the assignment is correct, based upon the finding of fact in the original opinion, i. e., that the defendant Railway Company "constructed a wing dam across the then channel of the river, a portion of said dam reached into the state of Texas." It was the act of constructing a portion of this dam in Texas, but for which the jury evidently found, no damage would have occurred, which bestows jurisdiction upon the courts of Texas in respect to the damage to the land, and not the location of the boundary line either in 1904 or 1912. I therefore concur that motions for rehearing shall be overruled.