W. C. Denny and H. G. Lee v. Frank B. Cotton et al.

No. 129.

1. **Riparian Owners—Accretion.**—The accretion by alluvion belongs to the owner of the shore where lands front upon the stream, and to which the accretion is made. So also where the accretion is the result of a dereliction occasioned by the gradual recession of the water from the land, and the making of a new channel. Such accretion, etc., must be a process that is gradual and imperceptible.

2. **Gradual and Imperceptible Changes of Shore.**—We believe the correct rule is announced in the cases of County of St. Clair v. Lovingston, 23 Wallace, 46; Jefferis v. East Omaha Land Company, 134 United States, 187; and The State of Nebraska v. The State of Iowa, 12 Supreme Court Reporter, 397, that "though the witnesses may see from time to time that progress has been made, they could not perceive it while the progress was going on." These conditions appear in the changes in the river current of the Rio Grande near El Paso, Texas.

3. **Accretions Apply to Navigable Streams and to National Boundaries.**—The principles of accretion and alluvion apply to lands bordering navigable streams as well as those not navigable. The doctrine, in absence of treaty stipulations otherwise, applies to streams that are boundaries between States or Nations.

4. **Calls in Survey — River as Line.** — The survey calling for the Rio Grande and its meanders as one of the boundaries of the tract, will not be limited to course and distance of the lines extended to the river shore, as called in the original field notes.

Appeal from El Paso. Tried below before Hon. T. A. Falvey.

*Carlton & Ruggles*, for appellants.—1. The evidence showed that the land in controversy was not within the bounds of any tract of land granted by the sovereignty of the soil to appellees, or to any other person from or under whom they claim title; and that on the 9th day of April, 1887, the land in controversy in this cause was vacant unappropriated public domain of the State of Texas, subject to pre-emption. Sayles' Statutes, art. 3911; Bathing Co. v. Heidenheimer, 63 Texas, 559; Fulton v. Frandolig, 63 Texas, 330; Treaty between U. S. and Mexico, 1848, art. 5, art. 6; Treaty between U. S. and Mexico, 1853, art. 1, art. 4; Barney v.

Keokuk, 94 U. S., 324; Schurmeier v. Railway, 7 Wall., 287; Howard v. Ingersoll, 13 How., 381; United States v. Pacheco, 2 Wall., 589; St. Clair County v. Lovingston, 23 Wall., 46; Jefferis v. Land Co., 134 U. S., 187; Saulet v. Shepherd, 4 Wall., 502; Rutz v. Seegar, 35 Fed. Rep., 188; Ang. on Tide Waters, 264–267, 249–258, 269, and ch. 3; Ang. on Waterc., 220; And. Law Dict., Accretion, Alluvion, Avulsion, Reliction; Bouv. Law Dict., same words; Burr. Law Dict., same words; 2 Black. Comm., 262; Coulson & F. on Waters, 22, 62, 94; Gould on Waters, secs. 76, 77, 158, 159; Houck on Rivers, 85–121, 147–174; Just. Inst. 2, sec. 23, and Alluvion; 3 Kent. Comm., 427, and note; Tied. on Real Prop., 685–687; McManus v. Carmichael, 3 Iowa, 1; Steele v. Sanchez, 72 Iowa, 65; Tomlin v. Railway, 32 Iowa, 106; Musser v. Hershey, 42 Iowa, 356; Haight v. Keokuk, 4 Iowa, 199; Wood v. Fowler, 26 Kan., 682; Lammers v. Nissen, 4 Neb., 245; Stevens v. Railway, 34 N. J., 537; Gould v. Railway, 6 N. Y., 543 (2 Seld., 522); Lynch v. Allen, 4 Dev. & Batt. (N. C.), 62; Shaw v. Oswego Iron Co., 10 Ore., 371; Boorman v. Sunnuchs, 42 Wis., 223.

2. The evidence showing that the southern boundary line of appellees' patented survey was the bank of the Rio Grande, and not the river itself, appellees were never riparian owners, but were and are limited by the high-water bank of the river, as it existed at the date of their survey in 1854, as their southern boundary, and have no claim to the land in controversy, whether it be the result of accretion or arise from other cause. Saulet v. Shepherd, 4 Wall., 507; Houck on Rivers, secs. 248–264, also chap. 4; Gould on Waters, secs. 197–200; East Haven v. Hemmingway, 7 Conn., 186; Middleton v. Pritchard, 3 Scam., 510; Canal Comrs. v. The People, 5 Wend., 243; Wheeler v. Spinola, 54 N. Y., 377; Child v. Starr, 4 Hill, 369; Yates v. Van De Bogert, 56 N. Y., 526; The State v. Jersey City, 1 Dutcher, 525; Bradford v. Cressey, 45 Me., 9; Dunlap v. Stetson, 4 Mason, 349.

*Davis, Beall & Kemp* and *Peyton F. Edwards*, for appellees.—1. (1) The land in controversy is alluvion, formed on the north bank of the Rio Grande since the date of the patent to the Burdett survey number 2, under which appellees deraign title; and as said survey and patent call for said river for its southern boundary, the addition made by such accretion belongs to the appellees by virtue of their riparian rights.

(2) The patent of the Burdett survey number 2 shows that the Rio Grande is its southern boundary, and it is a legal deduction that there is no vacant and public domain left for appropriation between the river and the river boundary of said tract.

(3) The riparian right to future alluvion is a vested right, and an inherent and essential attribute to the original property; and as the evidence shows that the pre-emption surveys of the appellants are in conflict with

the lines of the prior Burdett patent, extended to the Rio Grande, said surveys are null and void, and confer no right or title to the land in controversy upon the appellees. Jefferis v. Land Co., 134 U. S., 187; St. Clair County v. Lovingston, 23 Wall., 46–69; New Orleans v. United States, 10 Pet., 662; Saulet v. Shepherd, 4 Wall., 502; School v. Risley, 10 Wall., 110; Railway v. Schurmier, 7 Wall., 272; Yates v. Milwaukee, 10 Wall., 110; Jones v. Soulard, 24 How., 44; Benson v. Morrow, 61 Mo., 353; Linthicum v. Coan, 64 Md., 439; Gould on Waters, secs. 76, 85, 155.

2. (1) The evidence shows that the land in controversy was formed by a gradual and imperceptible accretion from, and consequent reliction of the water, extending over a period of twenty-five years, from 1862 to 1887, resulting from the deposits made upon the north bank and the erosion of the south bank of the Rio Grande River from year to year, during the annual and periodic floods commencing in April and lasting until August or September.

(2) The Rio Grande is one of the great torrential rivers of the west, having its annual periodic floods, resulting from the melting snows in the Rocky Mountains of the north. During its floods, in which the bed and banks of the river are often submerged for four or five months, constant changes are made in the banks and the channel of the river by the erosions made on the one side and increment deposited on the other, but this increment is always deposited when the river is at its flood, and under its muddy, turbid waters, and can not be perceived until after the flood subsides and the water seeks its deepest channel.

(3) When land is formed through a length of time, whether the stages of progress could be perceived or not is immaterial. The test of gradual and imperceptible, in the sense of the rule, is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while progress is going on. St. Clair County v. Lovingston, 23 Wall., 46–69; Benson v. Morion, 61 Mo., 353; Linthicum v. Coan, 64 Md., 439; Jefferis v. Land Co., 134 U. S., 187; Gould on Waters, sec. 155.

3. (1) The Rio Grande is not by nature a navigable river, and that the treaty of Guadalupe Hidalgo declares it a navigable stream did not change the rights of riparian proprietors; and in all cases where the river itself is used as a boundary, the law will expound the grant as extending " ad filum medium aquæ."

(2) But whether the river is navigable or not, the title of the appellees would extend at least to the margin of the stream, and they would be entitled to all the rights and incidents of riparian proprietors, and as such proprietors, entitled to all accretions adjacent to this land. Jefferis v. Land Co., 134 U. S., 187; St. Clair County v. Lovingston, 23 Wall., 46–69; Yates v. Milwaukee, 10 Wall., 110.

FISHER, CHIEF JUSTICE.—This was a consent consolidation of two actions of trespass to try title, brought by appellees July 15, 1887, in the District Court of El Paso County, respectively against appellant Denny and appellant Lee. February 20, 1890, appellees filed amended original petitions, in which, as against said appellants, respectively, they asserted title to the land in controversy, alleging same to be all those parts of the pre-emption surveys numbers 109 and 111 in conflict with Burdett survey number 2, claimed under title by appellees. February 24, 1890, each appellant in the suit against himself filed an amended original answer, containing, besides a general demurrer and plea of not guilty, a plea in the nature of a plea in reconvention, asserting title as against appellees, each to the land included within the lines of the pre-emption survey claimed by him. Each appellant had previously, August 18, 1887, filed in the suit against him an original answer, consisting of a general demurrer and a plea of the general issue. February 24, 1890, appellees filed in each case a supplemental petition, interposing as against appellants' respective assertions of title pleas of not guilty and five years limitation. Same day, February 24, 1890, after due consolidation of the two causes, they were tried as one cause by the court, without the intervention of a jury, and judgment rendered in appellees' favor for the land sued for.

We find the following facts:

1. Patent from the State of Texas to Joseph Magoffin, assignee of N. W. Burdett, dated February 20, 1858, to the following described land, being the Burdett survey number 2: 320 acres in El Paso County, Texas, on the east bank of the Rio Grande River, about two and one-half miles below El Paso, known as survey number 2; beginning at a stake the southwest corner of survey number 1; thence north 2368 varas to rock mound; thence west 672 varas to rock mound; thence south 3000 varas to a stake on the bank of the Rio Grande; thence down said river with its meanders to the place of beginning.

2. Appellees hold and own the foregoing described land by regular chain of title from Joseph Magoffin and wife down to themselves.

3. Both appellants claim the land in controversy as pre-emptors of the land in 1887, and as such pre-emptors they have complied with the terms of the then existing laws that permitted citizens of Texas to acquire public lands as pre-emptors, and have title to the land provided it was vacant at that time.

4. At the time the Burdett survey number 2 was located, in 1858, the banks and channel of the Rio Grande and low-water mark thereof was several hundred varas north of where the bank and channel and low-water mark of the river was in 1887, when the pre-emption claims of appellants were filed. That the bank and channel and low-water mark of the river has since 1858, where the Burdett survey number 2 originally abutted on

it, receded from the north and gone south several hundred varas. That this was occasioned by annual rises in the river from 1858 to the time of filing the pre-emption claims by appellants, and by the peculiar formation and shape of the banks at that point. The Burdett survey was situated on the north bank of the river, and called for a stake on the bank of the river and to run down the river with its meanders. Land extending about the width or more of the Burdett survey number 2, and about several hundred varas in distance, has since 1858, up to 1887, formed between the bank of the river as it existed in 1858 to where it existed when the pre-emption claims were located in 1887. It is this land upon which the appellants have located their pre-emption claims, and is the land in controversy. The shifting of the bank and channel of the river and the formation of that land was the result of the annual rises in the river during that period. That the river generally remained up at a high-water stage two or three months in each year. That after each rise the changes made in the channel and banks of the river could be seen and discerned, but they could not be perceived while the progress of changing was going on. That the change in the banks and channel of the river and the low-water mark existing when the pre-emption claims were located, as different from that existing when the Burdett survey was located, was not sudden, but was the result of the annual rises in the river during said period from 1858 to 1887.

5. That the said land so formed on the north side of the river and the land in controversy is a part of the Burdett survey number 2, and is the result of accretion and alluvion.

6. The land upon which the pre-emption claims of appellants were located, and being the same land in controversy, was not vacant public domain subject to location at that time, but was a part of the Burdett survey number 2, and the superior title thereto is in the appellees.

*Opinion.*—The appellants contend, that the call in the Burdett survey for the stake in the bank of the Rio Grande River as it existed in 1858, the time when the survey was made, should control, and that it should not be extended in course and distance so as to reach the bank of the river as subsequently formed; and that the land formed between the old river as it existed in 1858 and the new channel was vacant land, and subject to the location of the pre-emption claims of appellants.

Upon the other hand, appellees contend, that the facts of this case call for an application of law of accretion and alluvion. That the call of the Burdett survey for the bank of the river with its meanders will carry it to the middle of the channel or low-water mark of the river as newly formed, and that the land so formed since the location of the Burdett survey are the accretions thereto, caused by the deposit of alluvion.

thereon, or the dereliction resulting from the gradual recession of the water to the new channel and the gradual changing of the bed of the river.

This, in .effect, presents the diverse views of the parties to this controversy.

The main question we are called upon to decide is, Is the change in the bed of the river and the increase and addition to the land the result of alluvion or avulsion ? The appellees contend that it is the former, and appellants the latter.

The accretion by alluvion belongs to the owner of the shore whose lands front on the stream and to which the addition is made; also, such is the case where the accretion is the result of a dereliction occasioned by the gradual recession of the water from the land and the making of a new channel. This right rests upon the consideration, that while the riparian owner is liable to lose soil by the action of the water, he should also have the benefit of accretion resulting from the same cause. The principle is, that "he who bears the incidental burdens of an acquisition is entitled to its incidental advantages; consequently, that the proprietor of a field bounded by a river, being exposed to the danger of loss from its floods, is entitled to the increment which from the same cause may be gradually annexed to it." Accretion by alluvion, or the addition and gains to the soil by a recession of the water and the channel of the river, must be by a process that is gradual and imperceptible; otherwise the change falls within the meaning of avulsion, and such rapid and sudden change of the channel or banks of the stream will not bring about a change of boundary of the lands of the riparian proprietors.

There is a conflict of authority as to what is a gradual and imperceptible change, so as to make the addition to the soil alluvion, or gain to the riparian owner by a recession of the water and channel of the stream.

We believe the correct rule is announced in the cases of County of St. Clair v. Lovingston, 23 Wallace, 46; Jefferis v. East Omaha Land Company, 134 United States, 187; and The State of Nebraska v. The State of Iowa, 12 Supreme Court Reports, 397, where it is said, that "though the witnesses may see from time to time that progress has been made, they could not perceive it while the progress was going on."

The facts show, that the Rio Grande is subject to annual rises that occur in the spring and summer of each year, and that continue for two or three months; that during the stage of high water it is a violent, swift, and turbid stream. That the bank of the river on the south side, in the Republic of Mexico, opposite the land in controversy, is higher than on the north side of the river. That the force of the current strikes the south bank, and that during the period in which the accretion has been going on, as shown to exist in this case, the bank during each rise would cave in and wash away, and the channel of the river would move towards the south after each rise, and land would form on the north side. That

that formation and change was noticed and discerned after each rise. Some years the changes resulting from the rises in the river were greater than at other years. And that occasionally the progress and change made by the force of the current could be noticed while it was going on. But the evidence as a whole shows, that the general effect produced by these annual rises in the river during the period from 1858 to 1887 was the cause of the accretion and addition to the soil on the north side of the river, and was not the result of sudden changes.

Upon this subject we quote at length from the opinion in the case of State of Nebraska v. State of Iowa, 12 Supreme Court Reporter, 399:

"It is contended, however, that the doctrine of accretion has no application to the Missouri River, on account of the rapid and great changes constantly going on in respect to its banks; but the contrary has already been decided by this court in Jefferis v. Land Company, 134 United States, 178, 189 (10 Supreme Court Reporter, 518). A question between individuals, growing out of changes in the very place now in controversy, was then before this court; and in the opinion, after referring to the general rule, it was observed: 'It is contended by the defendant, that this well settled rule is not applicable to land which borders on the Missouri River, because of the peculiar character of that stream, and of the soil through which it flows, the course of the river being tortuous, the current rapid, and the soil a soft, sandy loam, not protected from the action of water either by rocks or the roots of trees; the effect being that the river cuts away its banks, sometimes in a large body, and makes for itself a new course, while the earth thus removed is almost simultaneously deposited elsewhere, and new land is formed almost as rapidly as the former bank was carried away. But it has been held by this court that the general law of accretion is applicable to land on the Mississippi River; and that being so, although the changes on the Missouri River are greater and more rapid than on the Mississippi, the difference does not constitute such a difference in principle as to render inapplicable to the Missouri River the general rule of law.' It is true that that case came here on demurrer to a bill, and it was alleged in the bill that the land was formed by 'imperceptible degrees,' and that the process of accretion 'went on so slowly that it could not be observed in its progress; but at intervals of not less than three or more months, it could be discerned by the eye that additions greater or less had been made to the shore.' The state of facts disclosed by this averment was held not to take the case out of the law concerning accretion; and, after referring to some English authorities, it was said: 'The doctrine of the English cases is, that accretion is an addition to land coterminous with the water, which is formed so slowly that its progress can not be perceived, and does not admit of the view that, in order to be accretion, the formation must be one not discernible by comparison at two distant points of time.' And then was quoted from the

opinion in St. Clair v. Lovingston, 23 Wallace, 46, these words: 'The test as to what is gradual and imperceptible, in the sense of the rule, is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.'

"The case before us is presented on testimony, and not on allegation. But what are the facts apparent from that testimony? The Missouri River is a winding stream, coursing through a valley of varying width, the substratum of whose soil, a deposit of distant centuries, is largely of quicksand. In building the bridge of the Union Pacific Railway Company across the Missouri River in the vicinity of the tracts in controversy, the builders went down to the solid rock, 65 feet below the surface, and there found a pine log a foot and a half in diameter—of course a deposit made in the long ago. The current is rapid, far above the average of ordinary rivers; and by reason of the snows in the mountains there are two well known rises in the volume of its waters, known as the April and June rises. The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks. Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently, where above the loose substratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible. Notwithstanding this, two things must be borne in mind, familiar to all dwellers on the banks of the Missouri River, and disclosed by the testimony: that while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water, and giving to the stream that color which, in the history of the country, has made it known as the 'muddy' Missouri; and also, that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible creation of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual, and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matter of increase of bank, always a mere gradual and imperceptible process. There is no heaping up at an instant, and while the eye rests upon the stream, of acres or rods on the

forming side of the river.   No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its resting and abiding place.   The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore.   There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other.   The only thing which distinguishes this river from other streams, in the matter of accretion, is in the rapidity of the change, caused by the velocity of the current; and this in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect thereto.

" Our conclusions are, that notwithstanding the rapidity of the changes in the course of the channel, and the washing from the one side and onto the other, the law of accretion controls on the Missouri River, as elsewhere; and that not only in respect to the rights of individual land owners, but also in respect to the boundary lines between States.   The boundary, therefore, between Iowa and Nebraska is a varying line, so far as affected by these changes of diminution and accretion in the mere washing of the waters of the stream."

What is said here of the Missouri River is equally true of the Rio Grande.

The fact that the Rio Grande, by virtue of the treaties between this Government and Mexico—that of 1848 ("Guadalupe Hidalgo") and that of 1853—is regarded and treated as a navigable stream, does not relieve the question before us of an application of the general law of accretion.   The principles of the law of accretion and alluvion apply to lands bordering navigable streams as well as those not navigable.   1 Am. and Eng. Encycl. of Law, 137; State of Nebraska v. State of Iowa, 12 Sup. Ct. Rep., 397; Jefferis v. Land Co., 134 U. S., 178; St. Clair County v. Lovingston, 23 Wall., 62.

This doctrine also applies to streams that are the boundary between two States or Nations, unless there is something in the treaties between the two countries that controls or limits the application of the principle of international law that denies the right of alluvion to riparian owners abutting the international stream.   This question is exhaustively discussed in the case of State of Nebraska v. State of Iowa, 12 Supreme Court Reporter, 397.

There is nothing in the treaties between this Government and Mexico that can be construed to affect the riparian owner's right of accretion and alluvion.

But the fact that the Rio Grande is by the treaties between the two nations treated as a navigable stream, and that it is the agreed international line between the two countries, may have the effect of limiting the boundary line of riparian owners to the low-water mark of the stream,.

and not to the middle of the channel. But be this as it may, it is unnecessary for us to decide whether the appellees' line goes to the middle of the stream or the low-water mark, as in either event the appellees' boundaries would include all the land fronting the river.

The Rio Grande at El Paso, fronting the land in controversy, while spoken of as a navigable stream, is not so in the sense of the common law where the tide ebbs and flows. The high-water mark is not the limit of the appellees' boundary, as would be the case if the Rio Grande was a navigable stream within the meaning of the common law. Authorities, supra; 2 Am. and Eng. Encycl. of Law, 504, 505; Jones v. Soulard, 24 How., 41.

It is insisted by appellants, that notwithstanding the addition to the land fronting the river was the result of accretions and alluvion, that the appellees' boundary should stop at the stake in the bank of the river as it existed in 1858, when the survey was made, because running the field notes of the survey course and distance from other points called for would locate the south line of the survey at the point where the bank of the stream was in 1858.

It may be true in some cases, that although gains have resulted in the soil fronting the stream by accretion and alluvion, the line will not be extended so as to include such additions of soil where it appears by calls in the grant that the object called for at the river was designed to fix and establish the boundaries of the land, and that the termini should rest at the object, and not the stream.

But such is not the case before us. It is apparent that the survey calls for the river and its meanders as one of the boundaries of the tract. These calls negative any purpose upon the part of the locator to leave any vacant land fronting the river not appropriated by his location.

There is nothing in the evidence that shows that the call for the river as a natural object should be made to yield to other calls in the grant. 2 Am. and Eng. Encycl. of Law, 504, 505; St. Clair County v. Lovingston, 23 Wall., 62; Jefferis v. East Omaha Land Co., 134 U. S., 187.

We find no error in the record, and affirm the judgment.

*Affirmed.*

Delivered April 26, 1893.


Application for writ of error refused.