## Ruby Hermon BUTLER, Independent Executrix, et al., Appellants,

v.

## Jerry SADLER, Commissioner of the General Land Office, et al., Appellees.

### No. 86.

Court of Civil Appeals of Texas.

Corpus Christi.

Jan. 27, 1966.

Rehearing Denied Feb. 24, 1966.

———◆———

Graves, Dougherty, Gee & Hearon by Robert J. Hearon, Jr., Austin, for appellants.

Waggoner Carr, Atty. Gen., by J. Milton Richardson, Austin, W. G. Winters, Jr., Houston, for appellees.

NYE, Justice.

This is a vacancy suit. Appellants filed suit in the district court of Cameron County, Texas, alleging that there is in existence in that county vacant, unsurveyed public school lands as described in their pleadings. The proceeding in the district court filed by the appellants was an appeal from the order of the Texas Land Commissioner who had determined that "no vacancy" could possibly exist on the lands in question. In appellants' suit they allege that they are entitled to establish the existence of vacant unsurveyed public school lands and their preferential right to purchase or lease such lands by virtue of Article 5421c, Vernon's Ann.Civ.St.

The appellees, being the principal defendants in the suit in the trial court, filed motions for summary judgment supported by affidavits, exhibits and depositions contending that as a matter of law no vacancy could exist in the area covered by the appellants' application. Appellants filed their motion for summary judgment, along with controverting affidavits and other exhibits. The trial court granted summary judgment in favor of the defendants and denied the motion for summary judgment filed by the plaintiffs. The plaintiffs have perfected their appeal to this Court.

The application and petition of the appellants allege that there exists as a possibility vacant unsurveyed public school land which they describe as mud flats. They contend that this is new land, formed between the shoreline of Laguna Madre as it existed in 1829, and the shoreline as it exists today along the east side of the Buena Vista Grant. The description of the land in their petition follows:

"* * * Said lands are described as situated in Cameron County, Texas, about 15 miles northeast from Brownsville, the County Seat, and bounded as follows, to-wit:

'One the West by the Potrero de Buena Vista Grant 1–465, originally granted to Manuel de la Garza Sosa by the State of Tamaulipas, Republic of Mexico; on the South and East by the Potrero Santa de Isabel grant and Laguna Madre; on the North by Laguna Madre, and on the East by Laguna Madre, it being intended by said application to include all of the unsurveyed public school land lying between said Potrero de Buena Vista Grant and Laguna Madre.'"

The Potrero de Buena Vista Grant and the Potrero Santa de Isabel Grant, are a part of the mainland of Texas. The east side of the grants front on the Laguna Madre. These two grants extend generally along the west side of the Laguna Madre from the Arroyo Colorado on the north to a point near, but some distance from the Rio Grande River on the south. The Laguna Madre is a continuous body of water running from Corpus Christi Bay on the north to the Brazos-Santiago Pass on the south and connects with the Gulf of Mexico on both ends. On the east side of the Laguna Madre is a long strip of land called Padre Island which runs almost the entire length of the coast between Corpus Christi and Brownsville. This island separates the Gulf of Mexico on the east and the Laguna Madre on the west.

Quoting directly from the apppellants' brief they say:

"Let us go straight to the heart of the matter. Our case depends upon acceptance of the thesis that submerged lands are in a special category, not subject to the vacancy act (Art. 5421c) and entirely separate and distinct from lands which are \* \* \*, we assert that areas which at some earlier time might have been submerged become subject to purchase or lease under the vacancy statute if they later lose their character as submerged lands \* \* \*"

Appellants contend in effect that there is a new category of land which has come into existence in the area bounded by their description. Whereas, formerly all of the land was either titled land or submerged land belonging to the State, there is now an intervening area of unsubmerged land subject to the provisions of the vacancy statute. Appellants argue that this land is not listed in any way in the records of the General Land Office as fast land.

The appellants likened the land which they contend exists as unsubmerged land as those lands described in the case of Luttes v. State, 159 Tex. 500, 324 S.W.2d 167, Sup.Ct. 1958. They contend that some of these mud flats in this area may be accretion to the upland and hence property of the upland owners and some as accretion to the islands which are not subject to purchase, but they contend that there is a possibility that there is land which can neither be shown as accretion to the mainland or accretion to the islands in the lagoon, that is unsubmerged and unsurveyed and therefore subject to purchase by them as discoverers.

It is important here to review briefly the legal history of the State's ownership of waters and submerged lands within the tidewater limits of the Gulf of Mexico. These submerged lands have always been treated in a special category since the earliest days of the Republic. State v. Delesdenier, 7 Tex. 76 (1851). On December 19, 1836, it was enacted by the Senate and the House of Representatives of the Republic of Texas that from and after the passage of that Act the civil and political jurisdiction of the Republic was declared to extend to the following boundaries, to-wit: "Beginning at the mouth of the Sabine River, and running west along the Gulf of Mexico three leagues from land, to the mouth of the Rio Grande, \* \* \*" Gammel's Laws of Texas, Vol. 1, p. 1193. In the resolution of the Congress of the United States pertaining to the Annexation of the Republic of Texas as a State into the Federal Union, of date March 1, 1845, 5 U.S. Statutes at Large 797, it was provided that the Republic retain for the State "all the vacant and unappropriated lands lying within its limits." The Congress of the Republic of Texas thereafter passed a joint resolution accepting the terms of annexation proposed by the United States. (2 Gammel's Laws 1200) Such action of the Congress of the Republic of Texas was ratified by popular vote of the people of Texas, and Texas was admitted to the Union by virtue of a resolution of Congress passed December 29, 1845, under which the State of Texas retained all of its public lands. 9 U.S. Statutes at Large 108.

The First Legislature of the State of Texas declared: "That the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the government of the said Republic, that such exclusive right is now vested in and belongs to the State, \* \* \*" (Acts First Legislature 1846, p. 155) Under the Treaty of Guadalupe Hidalgo the boundary line between the Republic of Mexico and the United States was defined as commencing in the Gulf of Mexico three leagues from land, opposite the mouth of the Rio Grande. "[I]t is clear that the Republic of Texas and the State of Texas have from the earliest days asserted title to the ownership of that portion of the Gulf of Mexico, and the soil at the bottom thereof, out to the limit

of three (3) marine leagues from shore." Preamble to the Act of 1941, 47th Legislature, p. 454, Ch. 286.

There have been numerous pronouncements made by the Legislature of this State concerning the public lands in the arms of the Gulf, the bays and tidelands. Art. 4026, V.A.T.S. (Acts 1925, 39 Legislature, p. 438, Ch. 178, § 1, Art. 7) which was a re-enactment of a prior statute which provides that " * * * All of the public rivers, bayous, lagoons, creeks, lakes, bays and inlets in this State, and all that part of the Gulf of Mexico within the jurisdiction of this State, together with their beds and bottoms, and all the products thereof, shall continue and remain the property of the State of Texas * * *." Art. 7467 V.A.T.S. provides in part: "The waters of the ordinary flow and underflow and tides of every flowing river or natural stream, of all lakes, bays or arms of the Gulf of Mexico, and the storm, flood or rain waters of every river or natural stream, canyon, ravine, depression or watershed, within the State of Texas, are hereby declared to be the property of the State * * *." Acts 1921, p. 233, sec. 2.

The State has consistently claimed title to the waters and submerged lands of the Gulf of Mexico, its arms, bays and tidewaters within the boundaries of this State. The courts of this State have zealously guarded and enforced the rights of this State to the public lands and have consistently held that the waters of the bays, inlets and arms of the Gulf of Mexico and the lands and bottoms underlining lakes, and bays, and the islands, reefs, shoals, marshes, and other areas along the Gulf of Mexico within the tidewater limits are the property of the State and are held by it in trust for the benefit of all of its inhabitants. Landry v. Robison, 110 Tex. 295, 219 S.W. 819; Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441; City of Galveston v. Mann, 135 Tex. 319, 143 S.W.2d 1028; Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410; Luttes

v. State, 159 Tex. 500, 324 S.W.2d 167; Rosborough v. Picton, 12 Tex.Civ.App. 113, 34 S.W. 791. See 60 Tex.Jur.2d p. 588 and 599 and 279.

In a case decided by the Supreme Court of Texas in 1932, the Court said that, "The rule long has been established in this state that the state is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets and other *areas within tidewater limits* within its borders." State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065, 1069. (Emphasis supplied)

The Constitution of the State of Texas, Article VII, Section 4, Vernon's Ann.St., provided that "The lands herein set apart to the Public Free School Fund, shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; * * *." See also Article VII, Section 12. In the Constitution of 1845 and 1861, school lands could not be sold but only leased. (Article X, Section 3, Constitution 1845; Constitution 1861). However, after the Civil War, it was realized that in order to stabilize the income from the permanent school fund, it was necessary to sell some of these lands. Under the Constitution of 1866 it was provided that the Legislature should from time to time provide for the sale of public lands granted to the perpetual public school fund. Article X, Sec. 4, Constitution 1866.

Articles 3498a and 3498j of the Revised Statutes of 1895 declared that public school, university, asylum and public lands shall be open to purchase by any person having the right to purchase such lands. However, the Supreme Court held that such articles did not give anyone the right to purchase lands under the water at ordinary high tide and uncovered at low tide. It was not contemplated that submerged lands which were the shallow waters of the San Jacinto Bay, an arm of the Galveston Bay, and hence a portion of the Gulf of Mexico were subject to purchase. The court went on to say that the Legislature by the use of the term

"public lands", did not contemplate the soil lying below the line of ordinary high tide "[i]n contemplation of law it was not land, but water." De Merit v. Robison, Land Commissioner, 102 Tex. 358, 116 S.W. 796, (1909).

Article 5323, V.A.T.S., (derived from Acts of 1919, 36th Legislature, R.S., p. 315, Ch. 163) provided for the sale of unsurveyed school lands to an applicant who could establish the existence of a vacancy. Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773, Sup.Ct. of Tex. 1933. The Supreme Court later that same year in the case of Cockrell v. Work, 122 Tex. 406, 61 S.W. 2d 787, Sup.Ct.1933, stated that the Camp v. Gulf Production Co. case, supra, must be construed as holding that Article 5323, enacted in 1919, is the only Act by virtue of which the citizen acting as the plaintiff could maintain a suit to determine whether a certain territory was a part of the unappropriated public domain of the State, belonging to the school fund and under such Act was authorized to determine whether a vacancy existed between certain patent lands. An examination of the original Act shows that one desiring to purchase any portion of the unsurveyed school lands believed to be public land would have to follow a well defined procedure. Camp v. Gulf Production Co., supra; Cockrell v. Work, supra. This Act was repealed by the Acts of 1931, 42nd Legislature, p. 452, Ch. 271, Sec. 13 now contained in Article 5421c, V.A.T.S. Also repealed were articles 5338 and 5374, V.A.T.S. relating to grouping of permits and the conditions on which permits for the development of oil and gas might be issued.

The appellants in effect describe the land they seek to establish as vacant unsurveyed public school lands formerly submerged and now above the line of mean higher high tide. This land admittedly at one time was the bottom of the Laguna Madre and now is above the line of mean higher high tide. See Luttes v. State, supra. The landowners of the original littoral Buena Vista Grant, originally owned their land to the shoreline.

The water and the bottoms of the lagoon which adjoined the littoral owners were originally public lands owned by the State of Texas. The land in question, if not owned by the littoral landowners of the Buena Vista Grant, still belongs to the State of Texas and would be considered as tidelands subject to overflow during floodtide. See Luttes v. State, supra.

These lands in the bays, whether they be islands, marshes, reefs or land within the tidewater limits, have never been subject to sale or lease as vacant and unsurveyed land. Before the enactment of the present Vacancy Statute originally in 1931, lands such as these were subject to lease by the Commissioner for oil and natural gas under Article 5353, V.A.T.S., (Acts of 1919). The Legislature provided that the following described lands would be subject to lease for oil and natural gas, to-wit: "All islands, salt water lakes, bays, inlets, marshes and reefs owned by the State within tide water limits, and that portion of the Gulf of Mexico within the jurisdiction of Texas, and unsold unsurveyed public free school lands * * *." Art. 5353, Acts 1919, 36th Legislature 2nd Call Session p. 51; see also 1917 Acts, 35th Legislature R.S., p. 158, Ch. 83, Sec. 1. The article under consideration, being 5421c, excluded from its control and sale "river beds, and channels, and islands, lakes and bays, and other areas within tide water limits." See Sec. 1; Art. 5421c. This was logical and necessary because the Legislature had heretofore provided for the leasing of such lands in Art. 5353, V.A.T.S. Although 5421c provided for all lands heretofore set apart to the public free school fund under the Constitution and the laws of Texas to be subject to control and sale under Art. 5421c, lands within the tidewater limits of the borders of the State of Texas were not a part of the public school fund at the time of the enactment of this article, and did not become a part of the public school fund until 1939. (Acts 1939, 46th Legislature, p. 465)

In 1899 the Legislature empowered the Governor and the Commissioner of the Gen-

eral Land Office to tabulate the condition of the account between the State of Texas and the permanent school fund, to ascertain the amount of public domain in the State of Texas at the time of the adoption of the Constitution in 1876. As a result of the Act of March 2, 1899, the Commissioner of the General Land Office prepared a report based upon the findings of a public commission duly appointed under the Act, which showed among other things, that the permanent free school fund had not received its full share of the public domain. That, in effect the school fund was entitled to 4,473,535 acres more than had been credited to it; that the remaining unsurveyed unappropriated public domain consisted of 3,275,628 acres within the Texas & Pacific Railway Reservation and 1,168,567 acres of public domain in the State of Texas exclusive of lakes, bays and islands on the Gulf of Mexico, amounting to an aggregate of 4,444,195 acres which is 29,340.27 less than is due by the State to the permanent school fund, after setting apart and appropriating to said 4,444,195 acres of unsurveyed and unappropriated land.

In the first called Session of the twenty-sixth Legislature, the Governor recommended the passage of a bill appropriating 4,444,195 acres of the remaining public domain being all of the acres referred to, exclusive of lakes, bays and islands on the Gulf of Mexico, making up the difference of 29,340.27 acres due the public free school fund by appropriating to such public free school fund sufficient money out of the general reserve fund. Specifically the Governor stated in reference to the 1,722,880 acres in the lakes and bays that: "In making up the account, my own judgment is that the area in lakes and bays—1,722,880 acres—should be discarded alltogether, and be permitted to remain as now for future disposition." See Senate Journal, First Call Session, 26th Legislature, p. 14, et seq, January 28, 1900. A bill was introduced in accordance with the Governor's recommendations and ultimately came out of the committee for public lands and the General Land Office as substitute Senate Bill No. 2. This Bill was passed by the Senate, amended and passed by the House, amended by a free conference committee and finally approved and passed on February 23, 1900. Senate Journal, First Call Session, 26th Legislature p. 21, January 24, 1900; p. 28, January 29, 1900; p. 36, January 30, 1900; p. 50, February 5, 1900; p. 128, February 21, 1900. The Bill became the Act of February 23, 1900 (11 Laws of Texas, 29) and contains as Section 1 the following:

"Section 1. For the purpose of adjusting and finally settling the controversy between the permanent school fund and the State of Texas, growing out of the division of the public domain, there is hereby set apart and granted to said school fund four million, four hundred and forty-four thousand and one hundred and ninety-five acres or all of the unappropriated public domain remaining in the State of Texas of whatever character, and wheresoever located, including any lands hereafter recovered by the State, except that included in lakes, bays, and islands along the Gulf of Mexico within tide water limits, whether the same be more or less than said four million, four hundred and forty-four thousand, one hundred and ninety-five acres; *provided, this act shall not have the effect to transfer to the school fund any of the lakes, bays and islands on the Gulf of Mexico within tide water limits whether surveyed or unsurveyed.*" (Emphasis supplied)

The emphasis supplied portion of the above quoted section was inserted by amendment upon the floor of the Senate before the first passage of the Bill and continued through as the final passage. This section of the Act of February 23, 1900, was carried into Article 5416 of the Revised Civil Statutes of 1925.

Article 5416, V.A.T.S., clearly excepted from the public school fund the lands included in lakes, bays and islands along the Gulf of Mexico within the tidewater limits

thereof. Fitzgerald v. Boyles, 66 S.W.2d 347, (Tex.Civ.App.1931, writ. dism.)

█ It is indeed clear to us that the Legislature did not intend that such tidewater areas be included under the operation of the Vacancy Act or that such areas be subject to sale or lease as vacant and unsurveyed land under Article 5421c, Section 6, because the Legislature specifically provided otherwise. Not only did the Legislature exclude such tidewater areas from sale to the general public, as set forth above, (5421c, Sec. 1) but it provides for a separate procedure for the leasing of such lands (5421c, Sec. 8). In the Acts of 1931, 42nd Legislature, p. 452, Ch. 271, which repealed Article 5323 and is now Article 5421c, Sec. 8, such Article provided for the leasing of "[a]ll islands, salt water lakes, bays, inlets, marshes and reefs owned by the State within tidewater limits, and that portion of the Gulf of Mexico within the jurisdiction of Texas." This Article and section was amended in 1939 under the heading "lands subject to lease" which described the same lands and all unsold public free school lands, both surveyed and unsurveyed. (Acts of 1939, 46th Legislature, p. 465, Sec. 2, p. 473). The Act further provided in Section 5, (now 5421c–3, Sec. 1) that "[a]ll lands set apart for the permanent free school fund and the several asylum funds by the Constitution and laws of this State and the mineral estate in river beds and channels, and the mineral estate in all areas within tidewater limits including islands, lakes, bays, and the bed of the sea, belonging to the State of Texas, are subject to control and disposition in accordance with the provisions of this Section and other pertinent provisions of this Act and other laws not in conflict herewith; * * *." Section 2 of Art. 5421c–3 provided that "[t]he mineral estate in river beds and channels and all areas within tidewater limits, including islands, lakes, and bays, and the bed of the sea, belonging to the State of Texas, are hereby set apart and dedicated to the permanent school fund."

While it is now true that both the mineral estate, Article 5421c–3, Section 2, V.A.T.S., and the surface estate, Article 5415a, Section 3, V.A.T.S., and islands, bays and lakes within the tidewater limits have now been dedicated to the public free school fund, it is also true that such lands are still not subject to sale or lease as vacant and unsurveyed lands under Article 5421c, Section 6. The Legislature in 1941 reasserted the complete ownership in the State of Texas of waters of the Gulf of Mexico, the arms of the Gulf, the beds and shores. (Acts of 1941, 47th Legislature, p. 454, Ch. 286, Art. 5415a, Section 3.) As late as 1961, the 57th Legislature in Article 5415e, made this declaration of the policy and purposes concerning state-owned submerged lands and islands:

"Section 1. The state-owned submerged lands and islands in the Texas Gulf Coast Area and the natural resources with which they are so richly endowed, constitute an important and valuable property right belonging to the Public Free School Fund and to all of the people of Texas. It is the declared policy of the state that such lands shall be so managed and used as to insure the conservation of such lands and resources and their development and utilization in the public interest. The value of such lands as public property for production and marketing of oil and gas and other minerals and for fishing, hunting, recreation, health and other uses in which the public at large may participate and enjoy, shall be considered as paramount, and private development shall be approved only if it does not significantly impair these values. *Further, it is the policy of this state not to sell any of its submerged lands or islands unless specifically authorized to do so by the Legislature.*" (Emphasis supplied)

We take special note at this point in our decision, to this declaration of the policy of our legislative branch of government concerning state-owned lands. Article 5421c,

Sec. 6 does not specifically authorize the sale or lease of the lands rising out of or a part of the arms of the bays and seas within the tidewater limits of the State of Texas to a "discoverer" under the Vacancy Act. Not only is there a lesser amount of royalty to be realized by the State for the sale of public school lands under the Vacancy Act, than if such lands were leased in accordance with the other existing laws, but it has always been the declared policy of the Legislature and the courts of this State to hold such public lands in trust for the benefit of all of the people of this State. Without clear language authorizing the sale or leasing of possible vacant lands in the tidewater limits of this State, we do not believe that the Legislature intended that such lands be awarded to anyone under the act in question.

Continuing on with other pertinent portions of this same Act (5415e, Section 1) the Legislature declared: "The purpose of this Act is to implement the foregoing policies by delegating to a Submerged Lands Advisory Committee and to the School Land Board, which shall be assisted by the Coastal Areas Management Division within the General Land Office, certain responsibilities and duties with respect to the management, control and use of the surface estate in state-owned submerged lands and islands to the end that:

(a) The natural resources of salt water lakes, bays, inlets or marshes within the tidewater limits shall be conserved; * * *

(c) Unauthorized encroachment upon and use of the surmerged lands and islands owned by the state shall be prevented; * * *."

"Sec. 2. As used in this Act, unless the context clearly requires otherwise: * * *

(d) 'Island' means any body of land completely surrounded by water located in a salt water lake, bay, inlet or other inland body of water within the tidewater limits of this state, or any portion of such body of land, and shall include man-made islands

resulting from dredging or other operations in such waters.

(e) 'Submerged lands' means any land extending from the shore line marking the boundary between the lands of the state and littoral owners, to the low water mark on any salt water lake, bay, inlet or other inland water within tidewater limits, and any land lying beneath such bodies of water but shall not include beaches on the open Gulf of Mexico, or land within the jurisdiction of the State of Texas which lies beneath the open waters of the Gulf of Mexico. * * *"

"Sec. 7. (a) Subject to the limitations contained * * *, the Board may lease the surface estate in state-owned islands and submerged lands, as defined in Section 2, upon such terms and conditions and for such lease rentals as it sees fit, provided the Board determines such lease is not contrary to the public interest. * * *"

"(d) All mineral rights, together with the right to explore for, produce and market same shall be reserved to the state, and such rights shall be the dominant estate in such lands. * * *"

"(g) No state-owned submerged land or islands as herein defined shall be leased except for industrial purposes including exploration and development of oil and gas under prior existing laws. Said industrial purposes shall not be construed to mean for the purposes of industrial waste disposal. * * *" Acts 1961, 57 Legislature, p. 841, Ch. 377.

■■ We believe that the decisions of the Supreme Court of Texas in Luttes v. State, 159 Tex. 500, 324 S.W.2d 167 (1958), and the Court of Civil Appeals 289 S.W.2d 357, Tex.Civ.App. (1956), are of controlling effect. In the Luttes case, supra, title to a specific 4086.61 acre mud flat lying along the east side of the Buena Vista Grant was in issue. This Buena Vista Grant was a littoral grant and its boundary along the Laguna Madre was the line of mean higher high tide. The 4086.61 acres between such Buena Vista Grant and the islands in the

Laguna Madre, was declared to be the property of the State of Texas. In effect such land amounted to accretion to the islands in the Laguna. Islands are clearly exempt from the operation of the Vacancy Act. It is clear and the appellants admit that (1) submerged lands, (2) mud flats representing accretion to the upland owners' property, and (3) mud flats representing accretion to islands, bars, reefs and shoals in the Laguna Madre, are not subject to sale or lease under the Vacancy Act. The question here to decide is whether land which is no longer submerged, and does not fit into any of the three above categories, but has formed out of and as a part of the bed of the sea, becomes land subject to sale or lease as vacant or unsurveyed land under Article 5421c, Section 6. Our Supreme Court said in Luttes v. State, supra, see 324 S.W.2d page 189:

"As before indicated, the factual theory of the petitioners-plaintiff is that the alleged accretions came about by gradual deposits of alluvion brought from the mainland and the Rio Grande by the fresh water of the Resaca de los Cuates and precipitation out upon reaching the waters of the Laguna. No doubt fast land arising from such a process, in so far as purely natural and imperceptible, would constitute accretions in the legal sense, and thus could, under the Mexican (Spanish) law as declared in State v. Balli [144 Tex. 195, 190 S.W.2d 71 (1944)], belong to the private owner of the abutting upland rather than to the State."

■ "But, as clearly deducible from Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830, supra, and the authorities therein cited, the mere fact that fast land has arisen by accretion and even adjoins the older upland does not necessarily make it the property of the upland owner. *If the process starts at an island or creates an island or a high point in the sea bottom and from there moves toward the older upland or mainland, becoming fast land as it goes, this new fast land is undoubtedly the property of the State.*" (Emphasis supplied) The court, in effect, held that even if the land became "fast land", the burden of proof rested upon the land owners to prove that the land in question was true accretion in the sense of a natural and imperceptible deposit and that it was an accretion to the original boundary of the grant. Luttes v. State, 159 Tex. 500, 324 S.W.2d 167 at 187. See Humble Oil & Refining Company v. Sun Oil Company, Fifth Circuit, 190 F.2d 191. If the landowner was unable to fulfill this burden, then such land was the property of the State of Texas. Whether the land in question is fast land in the form of an island, or a high point in the bottom of the sea, or land that grew and rose from the bottom and beds of the sea and became a part of the mainland, this new land, whether formed by natural and/or artificial means, is not fast land contemplated by the Legislature to be available for purchase or lease under the Vacancy Act.

■ In the Luttes v. State case, supra, the Supreme Court found that the littoral landowners' boundary was the point of mean higher high tide on the Laguna Madre. The Legislature excluded submerged land from the operation of the Vacancy Statute. In Article 5415e, Sec. 2, (e) the Legislature defined submerged lands as being "any land extending from the shore line marking the boundary between the lands of the state and littoral owners, to the low water mark on any salt water lake, bay, inlet or other inland water within tidewater limits, and any land lying beneath such bodies of water * * *." We approve this definition. Following this definition, clearly the land described in the Luttes case would constitute submerged lands as defined in Article 5415e, Section 2(e). In the case of Webb Materials, Inc. v. Lacey, 364 S.W. 2d 473, Tex.Civ.App. ref., n. r. e., 1963, in an opinion by Justice Pope, the court stated that " * * * City of Victoria v. Schott, 9 Tex.Civ.App. 332, 29 S.W. 681 (1895), is authority for the proposition that islands in the bed of a river at the time of the

grant, as well as those *arising in the bed* thereafter, belong to the State. The definition used by the court was first stated in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, and was re-affirmed in Maufrais v. State, 142 Tex. 559, 180 S.W.2d 144." (Emphasis supplied) We fail to find any perceptible difference between such lands as described by the appellant and land in the form of an island that arises from the bed of the sea. Accretion denotes the process of increasing real estate by the gradual and imperceptible disposition by water of solid material, through the operation of natural causes so as to cause that to become dry land that was before covered by water. Denny v. Cotton, 3 Tex.Civ.App. 634, 22 S.W. 122 (1893); 60 Tex.Jur.2d 295, Sec. 303. See Humble Oil & Refining Co. v. Sun Oil Co., 190 F.2d 191 (C.A. 5th 1951) on re-hearing 191 F.2d 705 (1951), cert. denied, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952); Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830 (1955); Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410 (1943); Fitzgerald v. Boyles, 66 S.W.2d 347 (Tex.Civ.App.1931) writ. dism.; State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (1944); City of Victoria v. Schott, 29 S.W. 681, 682 (Tex.Civ.App.1895) no writ, 8 Baylor Law Review, 359, 363.

Islands, bays and areas within tide limits are in a different category from lands contemplated under the Vacancy Act. This Act was to encourage the discovery of land which the State believed it had already patented and sold but which it had in fact not patented and sold because surveys revealed vacant strips between titled lands. Islands, bays and areas within tidewater limits cannot be sold for private purposes but can be leased for oil and gas mining under separate articles and statutes. Appellants' points where they complain that the trial court erred in granting the summary judgment to appellees as a matter of law are overruled. See 46 Tex.Jur.2d, Public Lands, Sec. 42, et seq; 34 Tex.Jur., Public Lands, Sec. 169, et seq; 42 Tex. Jur.2d, Oil and Gas, Sec. 321, et seq; 60

Tex.Jur.2d, Waters, Sec. 293, 294, et seq; City of Galveston v. Mann, 135 Tex. 319, 143 S.W.2d 1028, at page 1033 (1940). See Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830, at p. 835 (1955). Lorino v. Crawford Packing Company, 142 Tex. 51, 175 S.W.2d 410, at 413 and 414 (1943). See State v. Balli, 144 Tex. 195, 190 S.W.2d 71, at 99 and 100 (1944); Strayhorn v. Jones, 157 Tex. 136, 300 S.W.2d 623 (1957); Giles v. Ponder, 275 S.W.2d 509, Tex.Civ.App. (1955); Rudder v. Ponder, 156 Tex. 185, 293 S.W.2d 736 (1956); Humble Oil & Refining Co. v. Sun Oil Co., Fifth Circuit, 190 F.2d 191; State v. Arnim, Tex.Civ. App., 173 S.W.2d 503; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, (1937); Ray v. State, 153 S.W.2d 660, at 662 and 663, Tex.Civ.App., ref. w. o. m.; Short v. W. T. Carter & Brother, 133 Tex. 202, 126 S.W.2d 953 (1938); State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065 (1932); Landry v. Robison, 100 Tex. 295, 219 S.W. 819 (1920); see also Standard v. Sadler, 383 S.W.2d 391, Sup.Ct. (1964).

There are other provisions in Article 5421c which control the applicability of the appellants' application to establish a vacancy in the tidelands in Laguna Madre. The 1939 Vacancy Act, which amended the 1931 Vacancy Act, now Article 5421c, V.A. T.S. defines an applicant as "any person, other than a good faith claimant, who *discovers* and files application to purchase or lease a vacancy." (Emphasis supplied) (Acts of 1939, 46th Legislature, p. 466, Sec. 1(a); 5421c, Sec. 6(a), p. 437, V.A. T.S.) A similar definition appeared in Section 8 of the 1931 Act (H.B. No. 358, Acts of 1931, 42nd Legislature, p. 452, Ch. 271, Sec. 8). The Supreme Court of Texas construing the meaning of "discoverer" under Section 8 of the 1931 Act, held in the case of Short v. W. T. Carter & Brother, et al., 133 Tex. 202, 126 S.W.2d 953 (1938) that:

"The first condition is reasonable and its meaning and purpose are plain, for one should not be rewarded for 'dis-

covering' land already listed on the Land Office records. The listing of land on the records of the Land Office follows and could not precede its discovery. One of the proper places for making a record of school land belonging to the State is on the official maps."

This rule was followed in Spring v. Meco Production Co., 134 S.W.2d 828, Tex.Civ. App.1939, wr. dism., judg. corr., where the Court held that: An applicant for lands previously patented by the State of Texas was not a "discoverer". And in Glasscock v. Bryant, 185 S.W.2d 595, Tex.Civ.App. 1944, wr. ref., w.o.m., where an applicant for lands previously leased by the State was not a discoverer. These cases hold that where lands are listed on the official land office map, or have been patented by the State, or have been leased by the Commissioner of the General Land Office they do not qualify under the Vacancy Act for purchase or lease.

■ The boundary of the Buena Vista Grant is at the mean higher high tide line in the Laguna Madre by virtue of the title as a littoral grant and by the definition in Luttes v. State, supra. This Buena Vista Grant was titled by the Republic of Mexico in 1829. The record shows it was re-surveyed in 1855 and a confirmatory patent was issued by the State in 1873. The eastern boundary of Buena Vista Grant is at the Laguna Madre. The original surveyor surveying the Buena Vista Grant, upon reaching the Laguna Madre, said: "there being nothing ahead of us but water this second line came to an end." Some 4086.61 acres of the mud flats was adjudicated to be the property of the State of Texas (Luttes v. State, supra) as accretion belonging to and added to the islands in the Laguna Madre. If any land described as mud flats is genuine accretion that can be subsequently proved to be a part of the Buena Vista Grant, such land would of course be considered the same as titled lands. If such mud flats represent accre-

tion to islands or is new fast land that arose out of the bottom of the Laguna Madre, then it belongs to the State of Texas, and does not represent any land discovered by the appellants. All of this land, submerged and unsubmerged, was surveyed by the General Land Office maps by protraction in 1950. Field notes of actual surveys of much of this land were made and filed in the records of the General Land Office in 1937. The land covered by Laguna Atascosa National Wild Life Refuge Survey by the United States was filed in 1953. Judgment in the Luttes v. State case was rendered in September, 1955.

Section 6(a) of Article 5421c limits the appellants to land described in the Act as vacant unsurveyed land. " 'Vacancy,' when used in this Act, means an area of unsurveyed school land not in conflict on the ground with lands previously titled, awarded, or sold, which has not been listed on the records of the Land Office as school lands and which on the date of the filing was neither subject to an earlier subsisting application to purchase or lease by a discoverer or claimant nor involved in pending litigation brought by the State to recover the same." Section 3 of Article 5421c defines unsurveyed land " * * * to be all areas not included in surveys on file in the General Land Office or surveys delineated on the maps thereof." In the same section, the Act defines surveyed land within the terms contemplated by Article 5421c " * * * to be all tracts or parts of tracts heretofore surveyed either on the ground or by protraction, and set apart for the public school funds and which is unsold, and for which field notes are on file in the General Land Office or which may be delineated on the maps of said Office as such * * *." (Emphasis supplied) The entire Laguna Madre area from the Buena Vista Grant to Padre Island is shown by the record to have been surveyed upon maps by protraction and which maps are on file in the General Land Office. The Buena Vista Grant as a littoral grant calls for its eastern boundary

to be the Laguna Madre and is that boundary as has been defined in Luttes v. State by the Supreme Court of Texas. The protracted lines on the maps on file in the General Land Office were extended until they reached the upland Buena Vista Grant so that such survey on the maps on file in the General Land Office include all of the possible lands that could come under the appellants' application as either belonging to the State of Texas or to the owners of the Buena Vista Grant. We hold that the appellants are neither discoverers nor could such land be the unsurveyed land within the purview of Art. 5421c. Foster v. Gulf Oil Co., 335 S.W.2d 845, Tex.Civ. App.1960, wr. ref., n. r. e.; Barrow v. Boyles, 122 Tex. 416, 61 S.W.2d 783 (1933); Wright v. Nelson, 46 S.W. 261 (Tex.Civ. App.1898), er. ref.; Juencke v. Terrell, 98 Tex. 237, 82 S.W. 1025 (1904); Anderson v. Polk, 117 Tex. 73, 297 S.W. 219 (1927); Taylor v. Hoya, 9 Tex.Civ.App. 312, 29 S.W. 540 (1895); O'Keefe v. Robison, 116 Tex. 398, 292 S.W. 854 (1927).

■■■ Appellants' description of lands in their application to establish the alleged vacancy under Section 6(a) of Article 5421c, failed to describe any land sufficient for a surveyor to locate. In effect, appellants describe as vacant all of the unsurveyed public school land lying between the Buena Vista Grant and the Laguna Madre. Since the Buena Vista Grant calls for the Laguna Madre as its boundary on the east and since the Laguna Madre extends to the Buena Vista Grant on the west it is obvious that a surveyor could not locate any land between the Buena Vista Grant and the Laguna Madre. Although the description of an alleged vacant parcel of land need not be set out by a metes and bounds description, it must be sufficient for a surveyor to locate the land in question. Walker v. Kenedy, 133 Tex. 193, 127 S.W. 2d 163 (1938); Wright v. Nelson, 46 S.W. 261 (Tex.Civ.App.1898, wr. den.). The appellants described the land they intended to include in their petition when they said: "It being intended by said application to include all of the unsurveyed public school land lying between said Potrero de Buena Vista Grant and Laguna Madre." The Buena Vista Grant is admittedly a littoral grant and the boundary of which has been decided by the Supreme Court of Texas as being the shoreline which is that point at the mean higher high tide. The Legislature has defined "submerged lands" to mean "any land extending from the shoreline marking the boundary between the lands of the State and littoral owners to the low water mark on any salt water * * * bay * * * within tidewater limits, and any land lying beneath such bodies of water. * * *" If there were any land not belonging to the littoral owner of the Buena Vista Grant and lying between his boundary and the Laguna Madre it would certainly be "submerged lands" as defined by the Legislature and approved by this Court. Art. 5415e, Sec. 2(e). Submerged lands are excluded from the Vacancy Act. 5421c, Sec. 1. We hold that appellants have not described any vacant land sufficient for a surveyor to locate.

Appellees have attacked the appellants' application in numerous other particulars claiming fatal defects in the appellants' application and procedure. In view of our holding herein, we do not believe that it is necessary to discuss these additional points. Summary judgment was properly granted in favor of the defendants.

Appellees' counter points one through four are sustained, overruling all or parts of all of appellants' points of error one through three.

The judgment of the trial court is affirmed.

SHARPE, J., not participating.